## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **NIRVANA DURBAL**, on behalf of herself and those similarly situated,<br><br>Address to be filed in notice under seal,<br><br>Plaintiff,<br><br>v.<br><br>**ASSOCIATION OF AMERICAN MEDICAL COLLEGES**,<br>655 K Street NW, Suite 100<br>Washington, DC  20001<br>SERVE: Corporation Service Company<br>1156 15th St NW, Suite 605<br>Washington, DC  20005<br><br>Defendant. | Case No.  25-cv-2537<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Nirvana Durbal, on behalf of herself and all those similarly situated, brings this action against Defendant Association of American Medical Colleges for violations of the Sherman Antitrust Act and the District of Columbia's Consumer Protection Procedures Act.

Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury on all counts for which a right to trial by jury is allowed and, in support of this Complaint, alleges as follows:

## NATURE OF THE ACTION

1.     Medical doctors are essential to healthcare. They protect the wellbeing of every American with a skill developed through years of studying and apprenticeship. Young adults aspire to be doctors even though the educational path is long and expensive. U.S. medical schools cost on average nearly $60,000 per year

1

just in tuition and fees, and then graduates work for years in a residency program that pays so little that doctors often defer their loans during that time, racking up more interest cost.

2.      The Association of American Medical Colleges ("AAMC") operates a platform through which prospective medical students apply to medical school in the United States. The application process is two-part: a Primary Application run by AAMC and a Secondary Application run by the schools. The Primary Application, which collects the same general information about every applicant, can be submitted through AAMC to nearly every medical school in the country. After a medical school receives a Primary Application, it may invite the applicant to submit a Secondary Application through the school, which seeks additional information requested by the school. Many schools invite all applicants to submit Secondary Applications, while other schools set qualifications for Secondary Applications.

3.      The medical schools themselves control AAMC, working through it to fix the price that each student pays for Primary Applications to the medical schools. The fees for the 2026 application cycle are set at $175 for an applicant's first Primary Application and $47 for each additional school. Then, if an applicant's Primary Application succeeds, the applicant can expect to pay up to $200 to schools for each Secondary Application. Because the average applicant applies to 18.6 medical schools per cycle,[1] many applicants pay thousands of dollars in application fees alone. And

---

[1]    *2024 FACTS: Applicants and Matriculants*, AAMC, *available at* https://www.aamc.org/data-reports/students-residents/data/facts-applicants-and-matriculants.

many applicants pay even more because they apply to medical schools in multiple cycles and must pay the fees again.

4.     Instead of assisting aspiring medical students by reducing the economic burden of medical education, AAMC takes advantage of students' aspirations to be doctors by fixing exorbitant prices for medical school Primary Applications. AAMC illegally maintains a monopoly in the market for medical school application platforms and uses the millions in annual overcharges to kickback money to member medical schools.

5.     The unnecessary and price-fixed fees for Primary Applications burden aspiring doctors, especially students relying on loans to pay for their education.

6.     AAMC has a membership including every medical school accredited by the Liaison Committee on Medical Education—numbering at least 160 U.S. schools in total, including all major U.S. medical schools.

7.     More than 90% of U.S. medical schools require applicants to submit Primary Applications through the platform provided by AAMC.[2] AAMC's Member Medical Schools agreed through AAMC to charge the applicants a fee, and agreed through AAMC for that fee to be the same for applications to each Member Medical School. The Member Medical Schools fixed the price for the Primary Application fees rather than competing on price.

---

[2] *Medical School Admission Requirements (MSAR) Report for Applicants and Advisors: Primary Application Information 2026*, AAMC, *available at* https://students-residents.aamc.org/system/files/2025-04/MSAR005%20-%20MSAR%20Primary%20Application_0.pdf.

8.      AAMC—an ostensible not-for-profit organization—annually collects more than $50 million in Primary Application fees from applicants who have no other choice in this monopolized and restrained market. This colossal sum—averaged to over $50 per application—is untethered to AAMC's actual costs or to the value AAMC provides, which competing vendors could provide for a few dollars per application.

9.      Applications to other institutions of higher education have much lower application fees. The undergraduate Common Application, which offers a very similar application platform to AAMC, does not charge applicants a penny for its platform. Instead, undergraduate schools accepting the Common Application charge (and often decide not to charge) a comprehensive application fee that includes minimal platform costs. Business schools similarly incorporate the minimal platform costs into competitive, school-specific application fees. Without AAMC's unlawful price fixing and monopolization, medical school applicants would not pay the mammoth, standalone AAMC Primary Application fees. The D.C. Consumer Protection Procedures Act separately prohibits AAMC's unconscionably high fees, which are far above any value AAMC provides applicants.

10.     AAMC and its leadership have been wildly enriched by AAMC's unlawful price fixing and monopolization of medical school Primary Applications. In its most recent 501(c)(3) nonprofit filings covering FY 2023, AAMC reported more than $429 million in net assets. AAMC's President & Chief Executive Officer received nearly $1.6 million in compensation from AAMC and related organizations in FY

2023. And AAMC reported compensating fourteen other executives over $500,000 in FY 2023.

11.     AAMC has violated federal antitrust law and the D.C. Consumer Protection Procedures Act to gouge medical school applicants attempting to follow their dreams. Injunctive relief, treble damages, and other remedies are appropriate to rectify AAMC's wrongdoing.

## **VENUE AND JURISDICTION**

12.     Plaintiff's federal law claims arise under Sections 1, 2, and 3 of the Sherman Antitrust Act (15 U.S.C. § 1, *et seq*.). Plaintiff seeks damages under Section 4 of the Clayton Act (15 U.S.C. § 15), as well as injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26).

13.     This Court has subject-matter jurisdiction over Plaintiff's claims under 15 U.S.C. § 15 (because the federal claims arise from injuries Plaintiff suffered by reason of conduct forbidden in the antitrust laws); 28 U.S.C. § 1331 (because the federal claims arise under the laws of the United States); 28 U.S.C. § 1337(a) (because the federal claims arise under an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies); 28 U.S.C. § 1367 (because the District of Columbia claim is related to the federal claims over which this Court has subject matter jurisdiction so that the Court may exercise supplemental jurisdiction); and 28 U.S.C. § 1332 (because the nationwide class is minimally diverse and the amount in controversy for the class exceeds $5 million).

14.    This Court has personal jurisdiction over AAMC because it has its principal place of business in the District of Columbia.

15.    AAMC engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States. The activities of AAMC were within the flow of interstate commerce of the United States and these activities were intended to have, and did have, a substantial effect on interstate commerce of the United States. AAMC's platform is sold in the flow of interstate commerce.

16.    Venue is proper in this District pursuant to § 12 of the Clayton Act, codified at 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)–(d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and AAMC resides in this District.

## **PARTIES**

17.    Plaintiff Nirvana Durbal is a citizen of Georgia domiciled in Georgia. She is above 18 years of age.

18.    Defendant Association of American Medical Colleges is an Illinois corporation with its principal place of business in Washington, D.C. AAMC is recognized as a not-for-profit membership corporation under 26 U.S.C. § 501(c)(3).

19.    AAMC's membership includes all medical schools approved by the Liaison Committee on Medical Education ("Member Medical Schools").[3] AAMC also

---

[3] Several Canadian medical schools also are AAMC members, but those schools are not at issue in this Complaint.

includes as members health systems, hospitals, and academic societies. Many of the health systems or hospitals are controlled by Member Medical Schools.

<b>FACTUAL BACKGROUND</b>

**The Association of American Medical Colleges**

20.    AAMC was created and is operated, maintained, and controlled by its members, including the Member Medical Schools.

21.    The Member Medical Schools are direct competitors with each other and other medical schools for medical school applicants. They generally operate as independent decision makers except when they collude through AAMC.

22.    AAMC members elect AAMC's Board of Directors, who manage or direct AAMC's business and affairs. As of July 2025, 14 of the 19 members sitting on AAMC's Board of Directors work for a Member Medical School.

**AAMC's Primary Application Platform**

23.    Every application cycle, more than 50,000 people apply to medical school. An application cycle generally begins in the summer of the year before matriculation. So, for instance, the 2026 application cycle will begin in summer 2025 and run through summer 2026 for matriculation in fall 2026.

24.    While applicants compete with other applicants for acceptance, each medical school also competes with each other to woo the applicants to apply to, and ultimately attend, its institution.

25.    Nearly all medical schools require two separate applications: a uniform "Primary Application," submitted through AAMC, and a "Secondary Application," submitted through individual medical schools. This case concerns the uniform

Primary Application through AAMC, including the application structure that requires separate Primary and Secondary Applications.

26. AAMC operates the Primary Application through the American Medical College Application Service ("AMCAS"), described on AAMC's website as "the AAMC's centralized medical school application processing service. Most U.S. medical schools use the AMCAS program as the Primary Application method for their first year entering classes."[4]

27. Importantly, the AMCAS Primary Application is not simply a product independently developed by AAMC. Rather, AAMC's Member Medical Schools direct the features, structure, services, and other aspects of AMCAS.

28. Member Medical Schools serve on the "AMCAS Advisory Committee." According to AAMC, the AMCAS Advisory Committee "ensures that AMCAS is responsive to the needs of the admissions community and aligned with the AAMC's mission, vision, and strategies."[5]

29. Moreover, as noted above, Member Medical Schools control a supermajority of the seats on AAMC's board and thus control AAMC's development of the AMCAS Primary Application.

---

[4] *Apply to Medical School with the AMCAS Program*, AAMC, *available at* https://students-residents.aamc.org/applying-medical-school-amcas/apply-medical-school-amcas-program.

[5] *AMCAS Advisory Committee*, AMCAS, *available at* https://www.aamc.org/services/amcas-admissions-officers/advisory-committee. (although this page is behind a sign-in screen on AMCAS's website, this statement is visible from a Google search of the URL).

30.    Over 90% of all medical schools, including approximately 92% of Member Medical Schools, require applicants to submit Primary Applications through AAMC.

31.    The Member Medical Schools directed AAMC to develop a suite of software to process electronic applications. The software comprises both applicant-facing and Member Medical School-facing elements. This Complaint collectively refers to AAMC's offerings to both applicants and Member Medical Schools, including the application processing components and other features, as AAMC's "Primary Application Platform."

32.    On the applicant side, AAMC states:

> The American Medical College Application Service (AMCAS) is the AAMC's centralized medical school application processing service. Regardless of the number of medical schools to which you apply, you submit just one online application to the AMCAS system. Most U.S. medical schools use the AMCAS program as the Primary Application method for their entering classes.[6]

33.    AAMC charges applicants two types of fees for the AMCAS Primary Application: a $175 fee for the first school applied to through the AMCAS Primary Application and a $47 per school fee for each additional school. These are the rates for the 2026 application cycle. AAMC has charged Primary Application fees since at least 2021. While AAMC offers a limited number of need-based waivers to some

---

[6] *American Medical College Application Service (AMCAS)*, AAMC, *available at* https://students-residents.aamc.org/applying-medical-school-amcas/american-medical-college-application-service-amcas.

applicants, the vast majority of applicants do not receive waivers and must pay these fees.

34.    AAMC has charged the following Primary Application fees since the 2022 application cycle:

| Application Cycle | First Application | Additional Applications |
|---|---|---|
| 2022 | $170 | $42 |
| 2023 | $170 | $43 |
| 2024 | $175 | $45 |
| 2025 | $175 | $46 |
| 2026 | $175 | $47 |

35.    These fees are increased each year for all participating schools, without distinction.

36.    AAMC, at the direction of the Member Medical Schools that control it, sets the price it charges for the AMCAS Primary Application fees. There is no variation in pricing based on the schools an applicant applies to. The prices are fixed for every Member Medical School.

37.    Importantly, the AMCAS Primary Application fees are not the only fees that an applicant must pay as part of the application process. Applicants also must pay school-specific Secondary Application fees to most medical schools to which they apply. Member Medical School application fees generally range from $30–200 and are paid directly to the schools.[7] As a result, if the first Member Medical School to which the applicant applied had a $100 Secondary Application fee, the total application cost

---

[7] *Medical School Admission Requirements (MSAR) Report for Applicants and Advisors: Secondary Application Policies 2026*, AAMC, *available at* https://students-residents.aamc.org/system/files/2025-07/MSAR006%20-%20MSAR%20Secondary%20Application.pdf.

would be $275. If a second Member Medical School also had a $100 Secondary Application fee, that application would cost $147 in total.

38.    In contrast to the applicants, the medical schools do not pay for the Primary Application Platform. Member Medical Schools directed AAMC to provide the Primary Application Platform that the schools use at no cost. The back-end software the schools use enables them to review and process applications submitted through AAMC. This portion of AAMC's Primary Application Platform is akin to a business's customer relationship management ("CRM") system. AAMC's website confirms that AAMC members have "exclusive use" of AMCAS at no cost, and that the services "replace costly administrative infrastructure and personnel expenses for your medical school[.]"[8]

39.    The Member Medical Schools' direction to AAMC to formulate its Primary Application Platform in this way removed an economic incentive for Member Medical Schools to be independent decisionmakers in the market for medical school application platforms.

40.    AAMC's revenue is far higher than the costs of AAMC's Primary Application Platform and far higher than it would realize if the market were competitive.

**AAMC's Enrichment at the Expense of Applicants**

41.    The scheme by which the Member Medical Schools and AAMC have eliminated significant and feasible competition on both the applicant and medical-

---

[8] *Membership for Medical Schools*, AAMC, *available at* https://www.aamc.org/who-we-are/institutional-membership/medical-schools.

school side of its platform has proven incredibly lucrative for AAMC. According to its public tax filings, *AAMC collected $120 million in AMCAS Primary Application fees over just the last three reported years ($40,862,885 in FY 2023, $39,617,811 in FY 2022, and $40,893,841 in FY 2021).*

42.    AAMC—an ostensible not-for-profit organization—reported $429 million in total net assets at the end of FY 2023. A significant portion of those assets stem from the exorbitant and fixed fees that AAMC charges applicants.

43.    AAMC spends some of the fees it collects on massive compensation packages for executives. AAMC reported the following compensation in FY 2023:

      a.  President and CEO: $1,594,365

      b.  Executive Director, Research & Action Institute: $933,457

      c.  Chief Medical Education Officer: $910,997

      d.  Chief Health Care Affairs Officer: $870,045

      e.  Chief Services Officer: $820,724

      f.  Chief Strategic Operations and Data Officer: $732,812

      g.  Chief Diversity & Inclusion Officer: $683,317

      h.  Chief Legal Officer: $677,742

      i.  Advisor to the President: $670,312

      j.  Chief Public Policy Officer : $633,726

      k.  Chief Scientific Officer: $617,615

      l.  Chief of Staff: $609,710

      m. Chief Information Officer: $593,132

n.  Chief Learning Officer: $573,482

o.  Chief Financial and Administration Officer: $544,042

p.  Chief Communications and Marketing Officer: $484,704

44.    AAMC also reported paying $2.39 million in FY 2023 for employees to travel.

**Benefits to Member Medical Schools from Their Scheme with AAMC**

45.    To incentivize Member Medical Schools to quash competition between themselves on application price and quality, they receive substantial benefits from their price-fixing agreement through AAMC.

46.    First, Member Medical Schools receive stability from competition. They do not have to concern themselves with market pressures to change their platform for handling Primary Applications to what other medical schools use, such as adopting a different platform that would better serve applicants. Nor do they have to determine whether to compete on price with other medical schools for a platform for handling Primary Applications, such as by charging less to applicants or fully absorbing the cost of the platform.

47.    Second, AAMC uses the profits of the price-fixed application fees to pad its bank account and then kicks back money to Member Medical Schools. For instance, from FY 2022 to FY 2023, AAMC awarded a total of 56 grants together worth over $1 million to Member Medical Schools.

48.    Third, AAMC uses the profits of the price-fixed application fees to pad its bank account and then provide expensive services to Member Medical Schools,

such as millions of dollars worth of lobbying services. In FY 2023 alone, AAMC spent more than $2.3 million on lobbying on behalf of members.

49.    These incentives provided to Member Medical Schools cannot be matched by any competitor in the market for application platforms because a competitor would not have the profits from price fixing to provide these incentives.

**Comparative Competitive Markets for Application Services**

50.    Robust competition exists for secure application platforms in other sectors, confirming that AAMC and Member Medical Schools have unlawfully restrained competition and created and maintained a monopoly with AAMC's Primary Application Platform.

51.    Competitive markets for application platforms encourage competition on price because the costs for application platforms are born by the schools that choose to use certain platforms. The schools then compete with each other as independent market participants on the price of their total application fees—including whether to pass along processing costs to applicants. This competitive market differs sharply from the restrained, monopolistic market established by AAMC and Member Medical Schools where (1) schools bear no application processing costs and thus do not compete on whether to charge application processing fees and (2) the prices paid by applicants are fixed with potential competition barred by the schools and AAMC.

52.    Market competition has resulted in at least two models for higher-education application processing: (1) a centralized model where applicants apply to many schools through a central application service, and (2) a decentralized model

14

where schools are responsible for hosting their own applications. Both models can be operated competitively, significantly lowering costs and increasing choice for applicants, as compared to the uncompetitive model for Member Medical Schools, which fixes the prices for part of the application fee.

### Centralized Application Services

53.    The undergraduate Common Application operates as a centralized application service very similar to AAMC's Primary Application. Common Application applicants can apply directly through the Common Application's website. The Common Application offers most of the same features as AAMC's Primary Application, including soliciting and accepting letters of recommendation, compiling and reporting demographic information and GPA, and other general processing features. It also offers a backend platform for undergraduate admissions offices to review applications.

54.    Notably, like AAMC, the Common Application is a membership organization controlled by the schools who use the application. Unlike AAMC, the Common Application and its members have not fixed prices for application fees.

55.    Unlike AAMC, the Common Application does not charge applicants any fees for its application platform. Instead, the Common Application charges member schools a $2,500 flat fee per year, a $3.76–$4.80 fee per application (depending on the

platform a school uses), and a $2.00 payment processing fee if a school requires an application fee.[9]

56.    Individual schools determine the fee that they will charge applicants, or whether to charge any fee. Over 500 Common Application schools charge no application fee.[10] Thus, an applicant applying to one of these schools would incur no application costs. Those Common Application schools have made competitive decisions not to pass application costs to applicants, presumably with the goal of increasing applications.

57.    Such competition and benefits are not possible in the price-fixed, monopolistic market established by AAMC and the Member Medical Schools. Applicants must bear the costs of the Primary Application Platform regardless of the school to which they apply. And as illustrated by the fees charged to undergraduate schools by the Common Application, AAMC's fees charged to medical school applicants dwarf what a centralized application service could charge in a competitive market where schools and the centralized service have not insulated themselves from competition.

58.    The Common Application and similar competitive centralized application systems underscore that a centralized system does not require fixing prices. AAMC could offer a centralized application platform that encourages

---

[9]    *See    Pricing    &    Fees*,    Common    App,    *available    at* https://membersupport.commonapp.org/s/pricing.  The  Common  Application  also charges a one-time implementation fee for new member schools.
[10] *See Explore Colleges*, Common App, *available at* commonapp.org/explore.

competition. It has chosen instead to restrict and prevent competition at applicants'
expense.

### Decentralized Application Services

59.     Other schools and programs have adopted a decentralized model where
the school builds or contracts with a vendor to host its own application instance. In
particular, many graduate schools do not rely on centralized membership
organizations to provide an application service. The costs to applicants of a
decentralized model also are very low compared to AAMC's charged fees.

60.     For example, graduate business schools each have their own
applications and associated fees, and like medical school applications, business school
applications collect pertinent documents, information like test scores and GPA, and
other applicant information. Unlike medical schools, the business schools themselves
charge and collect all fees. The price paid by business school applicants to business
schools incorporates both the application platform (like that paid to AAMC by medical
students) and the institution-specific costs of applying (like that paid to the individual
schools by medical students). Business schools thus compete with each other on price
for the all-in cost to a business school applicant.

61.     By way of example, the application fees at private business schools
historically considered some of the best schools in the country can reach $250 –$275.[11]
But application fees to less historically prestigious or lower-ranked schools can be

---

[11] *See 2025-2026 Application Guide*, University of Pennsylvania Wharton School,
*available at* https://mba.wharton.upenn.edu/application-guide; *Application Process*,
Harvard          Business          School,          *available          at*
https://www.hbs.edu/mba/admissions/application-process.

significantly lower, as low as $30 per application.[12] This price competition to woo applicants to a school is the hallmark of a healthy, open market.

62.    Business schools can engage in this application-fee competition because the actual per-applicant costs for application software are very low. To illustrate, Georgia Tech uses the same application software for its business school as it does for all other graduate programs. That software is provided by an outside vendor. Georgia Tech pays that vendor a few dollars per application. With that low cost, it charges a $95 all-in application fee.

63.    In contrast, as noted above, a student applying to one medical school pays AAMC $175 just for AAMC's Primary Application Platform, more than a 7,000% markup on the application processing cost in a competitive market. And to reiterate, this fee is only for AAMC's Primary Application Platform. A medical school applicant generally still must pay any school-specific Secondary Application fee set and charged by each medical school.

64.    Multiple outside vendors provide application platforms for business schools, other graduate and professional schools, and undergraduate programs. Those include Salesforce, Oracle, Technolutions, and others.

65.    Because medical school admissions do not pose any unique technical requirements that could not be addressed by experienced vendors, these vendors very likely would be competitive forces in the relevant markets if not substantially foreclosed by AAMC and its Member School. Such competition would drive down the

---

[12] *Apply to MBA*, University of Florida Warrington College of Business, *available at* https://warrington.ufl.edu/mba/apply/.

price of AAMC's Primary Application Platform and incentivize increases in its quality. However, AAMC and Member Schools have substantially foreclosed access to that market with their agreements that prohibit price competition on a major part of the application fee.

**Irrational Conduct by Member Medical Schools**

66.     Top ranked medical schools are forgoing significant application fees to support the price-fixing scheme that they have entered into with AAMC and other Member Medical Schools.

67.     As noted above, highly ranked business schools command high application fees, often $250 or above. This is because there is significant demand for those schools based on their reputation and the expectation that applicants will have increased earning potential or career opportunities by attending those schools. Applicants are willing to pay high fees to apply. In contrast, lower ranked business schools can compete against higher-ranked schools for more applicants by charging a lower application fee.

68.     Lower ranked medical schools have forfeited their ability to compete on total application fee price. While some medical schools do charge lower Secondary Application fees, they still require applicants to use AAMC's Primary Application Platform for Primary Applications.

69.     This stands in stark contrast to lower ranked business schools who use low, all-in application fees to attract applicants who might not otherwise apply to their schools.

70.    In sum, the medical schools' price-fixing through AAMC has created a market where the Primary Application fees cost the same no matter the medical school to which an applicant applies. This would not be the case in a competitive market. In a competitive market, the Primary Application fees could be combined with Secondary Application fees so that medical schools could more-fully compete on price for their overall application fees. Alternatively, a competitive market could dispense with the need for Primary Applications altogether.

## RELEVANT MARKETS

71.    AAMC's conduct is unlawful in at least two relevant markets: the market for providing students with the education for a medical doctor degree (the "Medical Doctor Education Market"), and the market for a platform to handle primary applications to medical school (the "Medical School Primary Application Platform Market").

## Medical Doctor Education Market

72.    The Medical Doctor Education Market includes the Member Medical Schools and other medical schools in the United States, including its territories and the District of Columbia.

73.    The schools in the Medical Doctor Education Market are direct competitors with each other and with other U.S. medical schools for applicants to medical school. Each school usually operates as independent decision makers, one exception being when they collude through AAMC.

74.    The geographic scope of the Medical Doctor Education Market does not extend to countries outside the United States because most, if not virtually all,

prospective students considering applying to medical school consider U.S. medical schools as a distinct service because of its benefits for future employment in the United States.

75.    In the alternative, the Medical Doctor Education Market includes submarkets in which certain medical schools compete with other certain medical schools for applicants with comparable GPA, test scores, and other admissions criteria as may be determined by AAMC's own application data.

76.    The Medical Doctor Education Market does not include colleges of osteopathic medicine, which offer the degree Doctor of Osteopathic Medicine ("D.O."). D.O. programs are distinct in ways that cause applicants to consider them differently, such that an increase in price will not cause applicants to apply to a D.O. program rather than an M.D. program. The colleges of osteopathic medicine have their own association, the American Association of Colleges of Osteopathic Medicine, and this association runs its own application platform. The education is different in a D.O. program, with more focus on holistic medicine and alternative therapies such as manipulative treatment.[13] More than half of recipients of D.O. degrees work in primary care medicine, as opposed to around 25% of recipients of M.D. degrees.[14] Prospective students, and medical schools themselves, see colleges of osteopathic

---

[13] E.g., B. Murphy, *DO vs. MD: How much does the medical school degree type matter? Learn about key differences between MD and DO medical school programs and what role degree type can play in one's physician career path*, Am. Med. Ass'n (Apr. 28, 2025), *available at* https://www.ama-assn.org/medical-students/preparing-medical-school/do-vs-md-how-much-does-medical-school-degree-type-matter.
[14] *Id.*

medicine as somewhat less competitive than medical schools.[15] Prospective students are also more attracted to medical schools. For the 2024 school year, for example, there were more than four times the number of applications submitted to M.D. programs than D.O. programs (approximately 968,000 applications compared to 201,000).[16] Additionally, residency applicants with a D.O. degree have somewhat less of a chance of matching to any residence program than an applicant with an M.D. degree.[17] The data also suggest the most competitive residency programs typically favor applicants with M.D. degrees.

77.    The Medical Doctor Education Market is much larger than the market for doctors of osteopathic medicine. In 2024, more than twice the number of students entered an M.D. program than a D.O. program (approximately 23,000 compared to approximately 9,700).[18]

---

[15] *See How Is Medical School Different for Students Pursuing a DO vs an MD?*, UCLA Sch. of Med. (Apr. 26, 2017), *available at* https://medschool.ucla.edu/blog-post/do-vs-md-what-is-the-difference.

[16] *Compare 2024 FACTS: Applicants and Matriculants*, AAMC, *available at* https://www.aamc.org/data-reports/students-residents/data/facts-applicants-and-matriculants, *with Applicants & Matriculants by COM 2009-2024*, AACOM (Nov. 18, 2024), *available at* https://www.aacom.org/docs/default-source/research-reports/applicants-matriculants-by-com-2009-2024.xlsx?sfvrsn=a3634af4_10.

[17] *See Results and Data—2025 Main Residency Match* at 73, THE MATCH (May 2025), *available at* Main_Match_Results_and_Data_20250529_FINAL.pdf.

[18] *Compare 2024 FACTS: Applicants and Matriculants*, AAMC, *available at* https://www.aamc.org/data-reports/students-residents/data/facts-applicants-and-matriculants, *with Applicants & Matriculants by COM 2009-2024*, AACOM (Nov. 18, 2024), *available at* https://www.aacom.org/docs/default-source/research-reports/applicants-matriculants-by-com-2009-2024.xlsx?sfvrsn=a3634af4_10.

78.     The Medical Doctor Education Market also does not include physician-assistant programs, nurse-practitioner programs, or other healthcare programs that do not allow their graduates to become medical doctors.

**Medical School Application Platform Market**

79.     The Medical School Application Platform Market is the market for a platform to handle primary applications to U.S. medical schools. This market includes the Primary Application Platform run by AAMC and the application platforms used by the less than 10% of U.S. medical schools that do not use AAMC's Primary Application Platform.

80.     These other medical school application platforms include the Texas Medical and Dental Schools Application Service ("TMDSAS") created by the University of Texas System Board of Regents. For the 2026 Application Cycle, the TMDSAS primary application fee is $230, and the application can be submitted to as many as 14 Texas medical schools for the $230 fee.[19]

81.     The Member Medical Schools compete for applicants, and thus each is a competitor in the market for the platform for handling applications to medical school. Nearly all of the Member Medical Schools have chosen to use AAMC's Primary Application Platform.

82.     The geographic scope of the Medical School Application Platform Market is the United States, including its territories and the District of Columbia. AAMC is involved in the market throughout the United States, including in the District of

---

[19] *Application Guide*, TMDAS, *available at* https://www.tmdsas.com/application-guide/index.html.

Columbia. This market does not include applications to non-U.S. medical schools, such as to AAMC members in Canada.

83.    This market does not include Secondary Applications and their associated application platforms because Secondary Applications are distinct from Primary Applications. Secondary Applications are only extended to a subset of applicants, are administered by the schools themselves, and have different requirements specific to each school. Secondary Applications do not collect the general information processed with Primary Applications. And Secondary Applications collect distinct and varied information such as school-specific essays.

84.    Neither of the two relevant markets in this case relates to schools other than medical schools, such as colleges of osteopathic medicine, law schools, business schools, dental schools, or undergraduate schools. Because medical school is the only available option to receive an M.D. degree, other schools are not reasonable substitutes for medical schools.

## CLASS REPRESENTATIVE ALLEGATIONS

85.    Plaintiff submitted 11 Primary Applications through AAMC in the 2024 application cycle, which began in June 2023 for matriculation in fall 2024. She paid AAMC $625 for those applications ($175 for the first application and $45 each for the remaining applications).

86.    Plaintiff paid the Primary Application fees directly to AAMC for application to medical schools in the United States.

87.    Plaintiff was not permitted to apply by other means.

88.     AAMC's unlawful conduct allowed AAMC to overcharge Plaintiff for her Primary Application fees.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff brings claims, *infra*, on behalf of similarly situated persons against Defendant under Fed. R. Civ. P. 23(a) and 23(b)(3) and seeks certification of class defined as follows: All individuals in the United States, including its territories and the District of Columbia, who paid Primary Application Platform fees to AAMC to apply to a medical school in the United States, including its territories and the District of Columbia.

90.     The class period begins four years before the filing of this lawsuit for Counts I–III and three years before the filing of this lawsuit for Count IV.

91.     Plaintiff reserves the right to amend these definitions as discovery proceeds and to conform to the evidence.

92.     Excluded from the Class are Defendant, its agents, representatives, and employees; any judge to whom this action is assigned; and any member of that judge's staff and immediate family.

93.     While the exact number of the Nationwide Class is unknown at this time, Plaintiff submits that AAMC's publicly available data shows that at least 50,000 applicants have applied to Member Medical Schools each application cycle since 2021.

94.     Because the number of potential Class Members is so numerous, individual joinder of these members is impracticable.

95.    Plaintiff further alleges the Class Members will be ascertainable through discovery, including, but not limited to, Defendant's electronic records and databases, third-party discovery, and discovery concerning the identity of people who paid AAMC's fees for its Primary Application Platform.

96.    There are common questions of law and/or fact shared by Plaintiff and each Class Member. The common questions of law and/or fact include, but are not limited to, the following:

    a.  whether AAMC entered into or facilitated an agreement which restrained competition;

    b.  whether the agreement is unlawful;

    c.  whether AAMC maintains a monopoly;

    d.  whether AAMC uses unlawful means to maintain its monopoly;

    e.  whether AAMC's fees were unconscionable or otherwise unlawful under the D.C. Consumer Protection Procedures Act;

    f.  whether AAMC's conduct injured consumers; and

    g.  the appropriate nature of class-wide injunctive or other equitable relief.

97.    Certification of the Class under Fed. R. Civ. P. 23(a) and 23(b)(3) is appropriate as to the members of the putative class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. All Class Members were subject to the

same conduct by AAMC, as such conduct was AAMC's standard business practice to be applied consistently nationwide.

98.    A class action will cause an orderly and expeditious administration of claims by the members of the Class, will foster economies of time, effort, and expenses, and will ensure uniformity of decisions.

99.    Plaintiff's claims are typical of the claims of the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) since they are based on and arise out of identical facts constituting the wrongful conduct of AAMC.

100.    Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of other Class Members, and she will fairly and adequately protect their interests. Additionally, Plaintiff is cognizant of her responsibility as a class representative, and she has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action. Plaintiff's counsel has extensive experience in class action litigation.

101.    The Class Members have suffered the same or similar injury as the Plaintiff, including actual damages.

**COUNT I**
**HORIZONTAL RESTRAINT OF TRADE**
**IN THE MEDICAL DOCTOR EDUCATION MARKET,**
**IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT,**
**15 U.S.C. § 1**

102.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–101 as if fully set forth herein.

103.    This claim is brought by Plaintiff individually and on behalf of the Class.

104.    Medical schools compete with each other for applicants in the Medical Doctor Education Market. Medical schools compete for applicants based on qualities including price.

105.    The Member Medical Schools that use AAMC's Primary Application Platform—which are the vast majority of medical schools in the Medical Doctor Education Market—have used AAMC as a smokescreen cover to fix the price charged for Primary Application fees in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). These Member Medical Schools control AAMC, and through that control they have been able to fix the price of the Primary Application fee to be the same regardless of school.

106.    The Member Medical Schools made this agreement through AAMC, which they control.

107.    The Member Medical Schools exercise control over AAMC through, e.g., their election of the Board of Directors, which manages AAMC's affairs. Each Member Medical School has a vote for the Board of Directors members. As of July 2025, 14 of 19 Directors serving on the Board of Directors are employed by an AAMC Member Medical School.

108.    The Member Medical Schools direct the development, operation, and implementation of the AAMC Primary Application Platform, including through their operation of the AMCAS Advisory Committee.

109.    Through their control of the AAMC, the Member Medical Schools have used AAMC to facilitate concerted action between Member Medical Schools to fix the

price for nearly all Primary Applications, which every Member Medical School requires.

110.   AAMC is a separate legal entity from the Member Medical Schools. AAMC has conspired along with the Member Medical Schools to fix the price of Primary Application fees. AAMC benefits from the supracompetitive profits it earns from the price-fixed fees, using that to build up more than $400 million in net assets, pay its executives lavishly for a nonprofit, and kickback money to the Member Medical Schools.

111.   The Member Medical Schools each know that AAMC collects fixed fees for its medical school application platform from applicants. Indeed, many Member Medical Schools discuss AAMC's collection of these fees on their websites.

112.   The Member Medical Schools have explicitly agreed to restrict competition over the application fee in the Medical School Primary Application Platform Market through their operation of AAMC and direction of AAMC to provide its Primary Application Platform for a fixed price charged to applicants and provided free to the Member Medical Schools, including through their control of the AAMC Board of Directors and the AMCAS Advisory Committee. At the very least it is reasonable to infer an implicit agreement from the parallel conduct that nearly every Member Medical School uses AAMC for its Primary Application Platform and refuses to accept Primary Applications in any other manner. This is contrary to Member Medical Schools' interests to compete for applicants by offering more favorable and cost-effective application platforms for applicants. These Member Medical Schools'

agreements with each other and AAMC and refusal to accept Primary Applications in any other manner is not independently determined parallel conduct because of the Member Medical Schools' membership in and control of AAMC.

113.    AAMC also serves as the "hub" in a "hub-and-spoke" restraint of trade involving AAMC and the Member Medical Schools as "spokes."

114.    AAMC agreed to provide the Member Medical School with a free Primary Application Platform. In exchange, the Member Medical Schools agreed that AAMC could charge applicants a fixed and uniform price for Primary Application fees for every Member Medical School.

115.    Member Medical Schools entered into a "rim" agreement with each other when they elected representatives of the Member Medical Schools to serve on AAMC's Board of Directors and direct AAMC's business affairs, including by directing and overseeing AAMC's Primary Application Platform through AAMC and the AMCAS Advisory Committee. The Member Medical Schools' concerted conduct included fixing the price for Primary Application fees.

116.    The Member Medical Schools' agreement, through and with AAMC, intentionally, directly, and proximately caused the overcharging of Plaintiff and Class Members. The Primary Application fees that AAMC charged far exceed both the actual costs of processing and the fees that would be charged in a competitive market. Plaintiff thus seeks damages in an amount to be proven at trial under Section 4 of the Clayton Act (15 U.S.C. § 15), on behalf of herself and the Class.

117.    The restrained trade affects interstate commerce for several reasons, including because applicants in states across the country who apply to medical schools across the country were overcharged by AAMC for its Primary Application Platform fees.

118.    The Member Medical Schools' agreement to fix Primary Application fees constitutes a *per se* violation of the Sherman Act. The price fixing of the Primary Application fee is not a necessary, appropriate, or procompetitive, aspect of the Primary Application. The schools could easily direct AAMC to allow them to compete on price for Primary Applications. But, instead, AAMC's Primary Application Platform is a smokescreen cover for price fixing between the Member Medical Schools that require their applicants to use the Primary Application Platform. Given the lack of procompetitive benefits or justification, the price fixing is also necessarily a violation of the Sherman Act according to the Rule of Reason.

119.    There are no procompetitive benefits of the Member Medical Schools' agreement, by and through AAMC, to fix prices for Primary Applications, nor was there a legitimate or sufficient business justification. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

120.    AAMC, as conduit for, participant in, facilitator of, and beneficiary of an agreement to restrict trade between Member Medical Schools, is liable for the damages resulting from such agreement, including the overpayments by applicants to AAMC for the Primary Application Platform Fee.

121.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent because the injuries are higher costs and limited quality from an agreed restriction on competition. These injuries flow directly from that which makes Defendant's conduct unlawful: the agreed restriction on competition. Plaintiff is suing, on behalf of Class Members, to recover for injuries that she and the Class Members personally suffered, most notably the supracompetitive Primary Application Platform fees that she and Class Members paid to AAMC, which would have been lower or nonexistent absent the Member Medical Schools' unlawful conduct through AAMC.

## COUNT II
## HORIZONTAL RESTRAINT OF TRADE IN THE
## MEDICAL SCHOOL PRIMARY APPLICATION PLATFORM MARKET,
## IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT,
## 15 U.S.C. § 1

122.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–101 as if fully set forth herein.

123.    This claim is brought by Plaintiff individually and on behalf of the Class.

124.    AAMC entered into and engaged in unlawful concerted action with the Member Medical Schools, which unreasonably restrained trade in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

125.    AAMC is operated by the Member Medical Schools, which compete in the Medical School Primary Application Platform Market.

126.    The Member Medical Schools exercise control over AAMC through, e.g., their election of the Board of Directors, which manages AAMC's affairs. Each Member Medical School has a vote for the Board of Directors members. As of July 2025, 14 of

19 Directors serving on the Board of Directors are employed by an AAMC Member Medical School.

127.   The Member Medical Schools direct the development, operation, and implementation of the AAMC Primary Application Platform, including through their operation of the AMCAS Advisory Committee.

128.   AAMC facilitated an agreement by and amongst Member Medical Schools to fix prices in the Primary Application Platform Market by agreeing with the Member Medical Schools that AAMC will charge fixed fees to applicants for use of its Primary Application Platform, which nearly every Member Medical School requires applicants to use. Rather than collect fees for its Primary Application Platform from the Member Medical Schools, AAMC collects those fees directly from the applicants.

129.   AAMC, in agreement with the Member Medical Schools that control it, chose to set its pricing in this way rather than charging the schools to use the platform and enabling the schools to independently choose how much to charge each applicant, as the undergraduate Common Application does for its member schools.

130.   In practice, this agreement has set a fixed price for medical school Primary Application Platforms for nearly every applicant to nearly every Member Medical School.

131.   At the direction of Member Medical Schools that control AAMC, AAMC provides its Primary Application Platform to AAMC Member Medical Schools free of charge. This arrangement is confirmed by AAMC's website.

132.    The Member Medical Schools agreed that AAMC would not charge them for its application platform, and they maintain their membership in AAMC under such a guarantee.

133.    The Member Medical Schools each know that AAMC collects fixed fees for its medical school application platform from applicants. Indeed, many Member Medical Schools discuss AAMC's collection of these fees on their websites.

134.    The Member Medical Schools have explicitly agreed to restrict competition over the Primary Application Platform fee in the Medical School Primary Application Platform Market through their operation of AAMC and direction of AAMC to provide its Primary Application Platform for a fixed price charged to applicants and provided free to the Member Medical Schools, including through their control of the AAMC Board of Directors and the AMCAS Advisory Committee. At the very least it is reasonable to infer an implicit agreement from the parallel conduct that nearly every Member Medical School uses AAMC for its Primary Application Platform and refuses to accept applications in any other manner. This is contrary to Member Medical Schools' interests to compete for applicants by offering more favorable and cost-effective application platforms for applicants. These Member Medical Schools' agreements with AAMC and refusal to accept applications in any other manner is not independently determined parallel conduct because of the Member Medical Schools' membership in and control of AAMC.

135.    AAMC also serves as the "hub" in a "hub-and-spoke" restraint of trade involving AAMC and the Member Medical Schools as "spokes."

136.    AAMC entered into agreements with each Member Medical School under which AAMC agreed to provide the Member Medical School with a free Primary Application Platform. In exchange, the Member Medical Schools agreed that AAMC could charge applicants a fixed and uniform price for Primary Application fees for every Member Medical School.

137.    Member Medical Schools entered into a "rim" agreement with each other when they established, joined, and maintained AAMC as a 501(c)(3) membership organization.

138.    Member Medical Schools further entered into a "rim" agreement with each other when they elected representatives of the Member Medical Schools to serve on AAMC's Board of Directors and direct AAMC's business affairs, including by directing and overseeing AAMC's Primary Application Platform through AAMC and the AMCAS Advisory Committee.

139.    The Member Medical Schools' agreement, by and through AAMC, intentionally, directly and proximately caused the overcharging of Plaintiff and Class Members. The Primary Application fees that AAMC charged far exceed both the actual costs of processing and the fees that would be charged in a competitive market. Plaintiff thus seeks damages in an amount to be proven at trial under Section 4 of the Clayton Act (15 U.S.C. § 15), on behalf of herself and the Nationwide Class.

140.    The Member Medical Schools' agreement, by and through AAMC, further has restricted the ability for feasible competition in the Medical School Primary Application Platform Market. Competitors to AAMC cannot feasibly win

business from any Member Medical School because they cannot provide a platform for free and kickback money from applicants to the Member Medical Schools in the form of grants. Nor can any competitor possibly win business from any applicant because Member Medical Schools have agreed to not permit applicants to use application platforms other than AAMC's. This further protects the price-fixing conspiracy with AAMC, because Member Medical Schools do not provide an option for applicants to avoid the fees charged by AAMC.

141.    The restrained trade affects interstate commerce for several reasons, including because applicants in states across the country who apply to medical schools across the country were overcharged by AAMC for Application Platform fees.

142.    The Member Medical Schools' agreement to fix the Primary Application fee constitutes a *per se* violation of the Sherman Act. The price fixing in AAMC's Primary Application Platform of the Primary Application fee is not a necessary, appropriate, or procompetitive, aspect of the Primary Application Platform. AAMC's Primary Application Platform could easily be adjusted to allow for competition based on price for the Primary Application. But, instead, the AAMC's Primary Application Platform is a smokescreen cover for price fixing between the Member Medical Schools that require their applicants to use the Primary Application Platform. Given the lack of procompetitive benefits or justification, the price fixing is also necessarily a violation of the Sherman Act according to the Rule of Reason.

143.    There are no procompetitive benefits of the Member Medical Schools' agreement, by and through AAMC, to fix prices for the Primary Application Platform,

nor was there a legitimate or sufficient business justification. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

144.    AAMC, as conduit for, participant in, facilitator of, and beneficiary of an agreement to restrict trade between Member Medical Schools, is liable for the damages resulting from such agreement, including the overpayments by applicants to AAMC for the Primary Application fee.

145.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that she and the Class Members personally suffered, most notably the supracompetitive Primary Application fees that she and Class Members paid to AAMC, which would have been lower or nonexistent absent AAMC's unlawful conduct.

**COUNT III**
**MONOPOLIZATION**
**VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT,**
**15 U.S.C. § 2**

146.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–101 as if fully set forth herein.

147.    This claim is brought against AAMC by Plaintiff individually and on behalf of the Class.

148.    AAMC has willfully acquired and maintained a monopoly over the Medical School Primary Application Platform Market. It has acquired and maintained a market share exceeding 90%, which forecloses that substantial share

of the market from the many potential competitors that offer services that could compete.

149.    No other significant competitors exist in this market or can feasibly exist because of AAMC's willful maintenance of its monopoly through anticompetitive practices.

150.    AAMC has constructed illegitimate and insurmountable barriers to entry for competitors by structuring AAMC's Primary Application Platform in such a way that competitors have no feasible way to access potential customers on either side of the platform. These barriers include using the revenue from the price-fixed Primary Application fee to provide its service in the Medical School Primary Application Platform Market for free to medical schools.

151.    Potential competitors could not feasibly sell alternative application platforms to the Member Medical Schools that use AAMC's Primary Application Platform. Each of the Member Medical Schools that use AAMC's Primary Application Platform has chosen to use that platform despite knowing it charges a price-fixed fee. No competitor could feasibly, or legally, provide a competing platform to Member Medical Schools at no cost and while providing kickbacks to schools using price-fixed fees extracted from applicants, as AAMC does.

152.    AAMC also enters into exclusive agreements with nearly all Member Medical Schools for AAMC's Primary Application Platform. These agreements are *de facto* exclusive agreements because they are entered into by AAMC with the members

that control AAMC and have a biased interest in AAMC's continued monopolization of the market.

153.    Nor could any potential competitor feasibly sell alternative application platforms to applicants because nearly all Member Medical Schools prohibit the use of alternative application platforms by applicants, as part of their agreements with, operation of, and membership in AAMC. Indeed, nearly all Member Medical Schools require applicants to use AAMC's Primary Application Platform.

154.    The lack of any feasible competition has enabled AAMC to charge fees for Primary Application Platform that are far above those that could be charged in a competitive market. AAMC has exploited its monopoly power to charge supracompetitive fees.

155.    There are no procompetitive benefits of AAMC's monopolization scheme, nor was there a legitimate or sufficient business justification. Any ostensible benefits or justifications do not offset the harm caused by AAMC's anticompetitive and unlawful conduct.

156.    AAMC's monopolization scheme directly and proximately caused Plaintiff and Class Members to be overcharged for Primary Application Platform as compared to what they would be charged in a competitive market.

157.    Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that she and the Class Members personally suffered, most notably the supracompetitive

Primary Application fees that she and Class Members paid to AAMC, which would have been lower or nonexistent absent AAMC's unlawful conduct

**COUNT IV**
**UNFAIR TRADE PRACTICES**
**VIOLATIONS OF D.C. CODE § 28–3904**

158.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–101 as if fully set forth herein.

159.    This claim is brought against AAMC by Plaintiff individually and on behalf of the Class.

160.    AAMC made representations about and sold its Primary Application Platform to Plaintiff and all class members from its headquarters in Washington D.C. Plaintiff, all Class Members, and the general public made payments to AAMC at its headquarters in Washington D.C. for its Primary Application Platform.

161.    The Primary Application Platform is a consumer good or service. AAMC thus is a "merchant" within the meaning of the D.C. Consumer Protection Procedures Act.

162.    AAMC charges applicants unconscionable fees for its Primary Application Platform and thus has made and enforced unconscionable terms or provisions for its sale of its Primary Application Platform to applicants.

163.    The fees that AAMC charges bear no relation to the value of the Primary Application Platform, as illustrated by the prices charged for similar application platforms like the Common Application or graduate business schools.

164.    The fees also bear no relation to the actual cost of the Primary Application Platform, which at most costs a few dollars per application.

165.    Plaintiff and Class Members had no choice but to pay these unconscionable fees because they could not apply to their desired medical schools without paying AAMC's unconscionable fees for its Primary Application Platform. Indeed, applicants have no choice but to pay AAMC's fees when applying to over 90% of U.S. medical schools.

166.    AAMC knows that applicants have no choice but to pay AAMC's fees because nearly all of AAMC's Member Medical Schools require applicants use AAMC's Primary Application Platform. AAMC takes advantage of applicants' lack of choice by charging unconscionably high fees.

167.    AAMC also misled and deceived Plaintiff and Class Members by concealing the true value of its Primary Application Platform and failing to disclose that the fees it charges for its Primary Application Platform are grossly inflated.

168.    Plaintiff and Class Members were damaged by AAMC's unfair and deceptive conduct in an amount that may be determined at trial based on AAMC's records, including the amount of fees that Plaintiff and Class Members paid to AAMC for its Primary Application Platform.

## **PRAYER FOR RELIEF**

Plaintiff and the Class Members seek the following relief:

    a.  Certify the Class;

    b.  Enter a judgment awarding Plaintiff and the Class Members their damages, including treble damages, for the injuries they suffered as a result of AAMC's unlawful conduct;

c.  Award to Plaintiff and Class Members their costs of suit, including reasonable attorneys' fees and expenses, pursuant to, e.g., 15 U.S.C. § 15(a) and D.C. Code § 28–3905.

d.  Order that AAMC and its directors, officers, parents, employees, agents, successors, members be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

e.  Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

Dated: August 4, 2025

Respectfully submitted,

/s/ *Michael Burns*
Michael Burns (D.C. Bar No. 1026759)
HILGERS GRABEN PLLC
601 Pennsylvania Ave. N.W.
South Building, Suite 900
Washington, D.C. 20004
Telephone: 202-985-1664
mburns@hilgersgraben.com

William Burgess (Pro Hac Vice Forthcoming)
1230 Peachtree Street N.E., 19th Floor
Atlanta, GA 30309
Telephone: 404-595-7747
Email: wburgess@hilgersgraben.com

Bennett Rawicki (Pro Hac Vice
Forthcoming)
7859 Walnut Hill Lane, Suite 335
Dallas, TX 75230
Telephone: 469-640-6842
Email: brawicki@hilgersgraben.com

*Counsel for Plaintiff and the Proposed
Class*