# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**NIRVANA DURBAL**, on behalf of herself and those similarly situated,

        Plaintiff,

   v.

**ASSOCIATION OF AMERICAN MEDICAL COLLEGES**,

        Defendant.

Case No. 1:25-cv-02537-AHA

## MEMORANDUM IN SUPPORT OF ASSOCIATION OF AMERICAN MEDICAL COLLEGES' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    I.     Medical Education in the United States ................................................................ 4

    II.    The Association of American Medical Colleges ................................................. 5

    III.   Application Software Provided to Member Medical Schools .............................. 5

    IV.   Plaintiff's Claims ................................................................................................ 7

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

    I.     Counts I and II Fail Because the Complaint Alleges AMCAS Is in Substance a Joint Venture, so Its Price-Setting Is Not *Per Se* Illegal Under the Sherman Act .. 9

          A.    Multi-Firm Collaboration to Offer a Product Is a Well-Recognized Form of Joint Venture Under the Antitrust Laws ............................................... 9

          B.    The Complaint's Allegations Establish AMCAS Is a Joint Venture. ...... 10

          C.    As Price-Setting by a Joint Venture, AMCAS's Uniform Pricing Is Not *Per Se* Illegal Under the Sherman Act ................................................... 12

          D.    The Complaint Fails to Plausibly Allege the AMCAS Joint Venture Is Illegal Under the Rule of Reason .......................................................... 15

    II.    Counts II and III Independently Fail Because Plaintiff Lacks Antitrust Standing to Bring Claims Related to the Putative "Medical School Primary Application Platform Market." ............................................................................................ 17

    III.   Count III Independently Fails Because There Is No Plausible Allegation of Exclusionary Conduct. ..................................................................................... 21

          A.    A Section 2 Claim Requires Plausibly Pleading Exclusionary Conduct .. 21

          B.    The Complaint's Predatory-Pricing Allegation Fails ............................. 22

          C.    The Complaint's "*De Facto* Exclusive Agreement" Allegation Fails. .... 25

    IV.   Count IV Fails Because the Primary Application Fees Are Not "Consumer Transactions," the Fees Are Not Unconscionable, and the Nonprofit Safe Harbor Bars the Claim. ................................................................................................ 28

          A.    The CPPA Does Not Apply to the Fees Plaintiff Paid for Her Professional Purpose to Become a Medical Doctor ................................................... 28

          B.    The Complaint Fails to Plausibly Allege the Primary Application Fees that Plaintiff Paid Were "Unconscionable." ................................................. 30

          C.    The CPPA's Nonprofit Safe Harbor Bars Count IV Because the Claim Arises from Nonprofit Membership, Training, and Credentialing ........... 33

CONCLUSION ................................................................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016) ................................................................... 18

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010) ................................................................... 9, 10

*In re APA Assessment Fee Litig.*,
766 F.3d 39 (D.C. Cir. 2014) ................................................................... 34

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019) ................................................................... 9

*\*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................... 8, 26, 31

*\*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................... 8

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
49 F.4th 520 (5th Cir. 2022) ................................................................... 26, 28

*\*Broad. Music, Inc. v. Colum. Broadcast. Sys., Inc.*,
441 U.S. 1 (1979) ................................................................... *passim*

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ................................................................... 22, 23

*Carter v. Bank of Am., N.A.*,
888 F. Supp. 2d 1 (D.D.C. 2012) ................................................................... 32, 33

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ................................................................... 10

*Corp. Accountability Lab v. Sambazon, Inc.*,
340 A.3d 1277 (D.C. 2025) ................................................................... 30

*Covad Commc'ns Co. v. Bell Atlantic Corp.*,
398 F.3d 666 (D.C. Cir. 2005) ................................................................... 9

*Dial a Car, Inc. v. Transp., Inc.*,
82 F.3d 484 (D.C. Cir. 1996) ................................................................... 23, 25

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ................................................................. 8

*In re EpiPen (Epinephrine Injection, USP) Mktg.,*
*Sales Practices & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ................................................. 25, 26, 27

*Fed. Trade Comm'n v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021) .............................................................. 9

*Ford v. ChartOne, Inc.*,
    908 A.2d 72 (D.C. 2006) ................................................................. 31, 32

*\*Fotobom Media, Inc. v. Google LLC*,
    719 F. Supp. 3d 33 (D.D.C. 2024) ....................................... 17, 18, 19

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................ 33

*Gross v. Wright*,
    185 F. Supp. 3d 39 (D.D.C. 2016) ....................................... 12, 13, 17

*In re Int. Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017) ........................................... 15, 17

*Johnson v. Comm'n on Presidential Debates*,
    869 F.3d 976 (D.C. Cir. 2017) ............................................................... 17

*Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*,
    No. 23-cv-3570 (CRC), 2024 WL 4239936 (D.D.C. Sept. 19, 2024) ................. 36

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ............................................................................... 13

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    295 F. Supp. 2d 30 (D.D.C. 2003) ........................................................ 18

*Lund v. Watergate Invs. Ltd.*,
    728 A.2d 77 (D.C. 1999) .......................................................................... 32

*MacDonald v. Thomas M. Cooley Law School*,
    724 F.3d 654 (6th Cir. 2013) ................................................................ 29

*In re McCormick & Co.*,
    217 F. Supp. 3d 124 (D.D.C. 2016) ............................................... 16, 17

*NCAA v. Alston*,
    594 U.S. 69 (2021) ................................................................... 10, 13, 14

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)..................................................................................... 10

*\*Ohio v. Am. Express Co. (Amex)*,
    585 U.S. 529 (2018)....................................................................... 16, 19, 20, 21

*Oliver v. SD-3C LLC*,
    2015 WL 10890656 (N.D. Cal. Sept. 30, 2015).............................................. 15

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc. (linkLine)*,
    555 U.S. 438 (2009)................................................................................ 23, 25

*PhantomALERT v. Apple, Inc.*,
    762 F. Supp. 3d 8 (D.D.C. 2025)...................................................................... 19

*Qureshi v. Am. Univ.*,
    No. 20-cv-1141 (CRC), 2023 WL 2387811 (D.D.C. Mar. 7, 2023)............................. 29, 35

*\*Rambus Inc. v. FTC*,
    522 F.3d 456 (D.C. Cir. 2008)....................................................................... 21, 24

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)......................................................................................... 35

*Reynolds v. Concordia Univ.*,
    No. 21-CV-2560, 2022 WL 1323236 (D. Minn. May 3, 2022)................................... 30

*Goodrich ex rel. Robert D. Goodrich Revocable Tr. v. Bank of Am. N.A.*,
    136 F.4th 347 (D.C. Cir. 2025)......................................................................... 34

*\*Shaw v. Marriott Int'l, Inc.*,
    605 F.3d 1039 (D.C. Cir. 2010)........................................................... 3, 28, 29, 30

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)............................................................................................ 13

*\*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)...................................................................................*passim*

*United States v. Google LLC*,
    687 F. Supp. 3d 48 (D.D.C. 2023)...................................................................... 22

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024)......................................................... 25, 26, 27

*\*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).......................................................................*passim*

*United States v. Penn-Olin Chem. Co.*,
  378 U.S. 158 (1964) ........................................................................................... 10

*United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*,
  144 F.4th 976 (7th Cir. 2025) ..................................................................... 23, 25

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP* (*Trinko*),
  540 U.S. 398 (2004) .................................................................................... 21, 22

*Walgreen Co. v. AstraZeneca Pharm. L.P.*,
  534 F. Supp. 2d 146 (D.D.C. 2008) ...................................................................... 22

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*,
  892 F.3d 332 (D.C. Cir. 2018) ................................................................................ 4

**Statutes**

15 U.S.C. § 37b(1)(E) ................................................................................................. 35

15 U.S.C. § 37b(a)(1)(A)(E) ......................................................................................... 4

26 U.S.C. § 501(c)(3) ................................................................................................... 5

42 U.S.C. § 256h ......................................................................................................... 5

D.C. Code § 28-3904(r) & (r)(3) ................................................................. 30, 31, 32

D.C. Code § 28-3905(k)(5) ................................................................................. *passim*

D.C. Consumer Protection Procedures Act ........................................................ *passim*

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
  Principles and Their Application ........................................................................... 9

Sherman Act, Section 1, 15 U.S.C. § 1 .............................................................. *passim*

Sherman Act, Section 2, 15 U.S.C. § 2 .............................................................. *passim*

**Other Authorities**

52 D.C. Reg. 6834 (July 22, 2005) ............................................................................ 36

AAMC, *AMCAS*, https://students-residents. aamc.org/applying-medical-school-
  amcas/about-amcas-program ................................................................................. 6

*Credential*, Merriam-Webster Dictionary Online, https://www.merriam-
  webster.com/dictionary/credential (last accessed October 8, 2025) .................. 34

AAMC, *American Medical College Application Service (AMCAS)*,
https://students-residents.aamc.org/applying-medical-school-amcas/american-
medical-college-application-service-amcas .................................................................. 4, 6

AAMC, *Report for Applicants and Advisors: Primary Application Information
2026*, https://students-residents.aamc.org/system/files/2025-
07/MSAR005%20-%20MSAR%20Primary%20Application_0.pdf .................................... 6

*Train*, Merriam-Webster Dictionary Online, https://www.merriam-
webster.com/dictionary/train (last accessed October 8, 2025) .......................................... 34

## INTRODUCTION

The Association of American Medical Colleges (AAMC) has worked for nearly 150 years to improve medical education, health care, and medical research across the United States. One aspect of AAMC's work is the American Medical College Application Service® (AMCAS®)—application software enabling applicants to submit a single primary application to multiple medical schools that use the software.

As the Complaint reveals, AMCAS has long benefited both the medical schools that offer Doctor of Medicine degrees (M.D.) and their applicants. There are far more applicants to medical school each year than available seats at medical schools. Candidates therefore generally apply to multiple medical schools—on average, more than 18 schools per admissions cycle—to improve their chances of admission. AMCAS enables applicants to apply to multiple medical schools more easily through a single primary application, minimizing the time, expense, and hassle that dozens of separate and unique submissions would require. Similarly, AMCAS benefits medical schools that use the software by reducing the time and cost needed to review applications through standardizing the collection of applicant data, verifying application materials, conducting centralized background checks, and facilitating efficient review. AMCAS therefore expands output by making it easier for applicants to apply and easier for schools to review the increased volume of applications.

Despite AMCAS's longstanding and obvious procompetitive benefits, the Complaint attempts to distort AAMC's operation of AMCAS into antitrust and consumer protection violations. The Complaint brings four claims: two under Section 1 of the Sherman Act contending AMCAS's fees constitute *per se* illegal price fixing in different putative markets, a third under Section 2 of the Sherman Act contending AMCAS constitutes unlawful monopolization, and a fourth under the D.C. Consumer Protection Procedures Act contending AMCAS's fees are

unconscionable. The Complaint's attempts to distort AMCAS into an unlawful product are meritless. All four claims fail to state a claim upon which relief can be granted.

*First*, Counts I and II fail to state Section 1 price-fixing claims. Count I asserts a *per se* illegal "hub-and-spoke" conspiracy among AAMC (as the purported hub) and medical schools (the purported spokes) to price-fix primary application fees in a putative "Medical Doctor Education Market." Count II asserts an identical *per se* price-fixing claim in a putative "Medical School Primary Application Platform Market." Supreme Court precedent forecloses both price-fixing claims as a matter of law. The Complaint substantively alleges that AMCAS is a joint venture under federal antitrust law. Thus, under *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), AMCAS's price-setting is not "price fixing" for purposes of antitrust law, much less a *per se* violation of Section 1.

*Second*, Counts II and III independently fail because the plaintiff—a former medical school applicant—lacks antitrust standing in the putative "Medical School Primary Application Platform Market." According to the Complaint, the participants in that market for purposes of antitrust standing are medical schools and application software providers—not medical school applicants. This deficiency is incurable because medical schools, not applicants, choose which application system they will use and how they will accept applications.

*Third*, Count III independently fails because the Complaint does not plausibly allege exclusionary conduct—an essential element for a Section 2 monopolization claim. Exclusionary conduct is an act that forecloses or undermines competitors' ability to compete. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). The Complaint's attempt to allege exclusionary conduct is not only conclusory—it is legally insufficient. AAMC's decision not to charge medical schools for AMCAS does not exclude competitors from the putative "Medical

2

School Primary Application Platform Market," because low prices cannot be exclusionary under the antitrust laws unless they are predatory—i.e., short-term pricing below cost with the ability to recoup the short-term losses in the future through long-term higher pricing. The Complaint pleads no facts to establish predatory pricing. Nor do AAMC's purported "*de facto* exclusive agreements," Compl. ¶ 152, constitute exclusionary conduct. Even if the Complaint plausibly alleged the existence of such agreements—and it does not—they would not qualify as exclusionary conduct because the Complaint fails to allege facts showing they foreclose competition from other actual or potential application platforms. Notably, the Complaint does not even allege the purported "*de facto* exclusive agreements" are of sufficient duration to foreclose competition, as the law requires for such a claim. And the Complaint recognizes that AAMC member schools, including Texas medical schools, use competing application software. Compl. ¶ 80.

*Fourth*, Count IV fails to state a claim under the D.C. Consumer Protection Procedures Act (CPPA), D.C. Code § 28-3904 (2025). For starters, the CPPA does not apply to Plaintiff's transactions at issue under *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043–44 (D.C. Cir. 2010). And even if the CPPA did apply, the Complaint fails to plausibly allege AMCAS's primary application fees are "unconscionable." Moreover, the CPPA's nonprofit safe harbor bars the claim entirely under D.C. Code § 28-3905(k)(5).

AMCAS is a procompetitive product that benefits applicants, medical schools, and medical education in the United States. It is precisely the type of product that the antitrust laws seek to promote, and its fees are far from "unconscionable." AAMC accordingly asks the Court to dismiss the Complaint in its entirety and preserve the benefits of AMCAS for America's medical schools and future classes of medical school applicants.

# BACKGROUND[1]

## I.    Medical Education in the United States

The American medical education system "has produced the finest physicians and medical researchers in the world." 15 U.S.C. § 37b(a)(1)(A). Medical schools in the United States pursue the "crucial missions of patient care, physician training, and medical research." 15 U.S.C. § 37b(a)(1)(E). The doctors they train are essential to healthcare and "protect the wellbeing of every American." Compl. ¶ 1. For that reason, medical education is highly regulated. An expansive array of state laws and regulations govern medical education and licensure, and these requirements shape medical education.[2] For instance, most medical schools require applicants to undergo criminal background checks, both to ensure patient safety and to confirm that their graduates will ultimately be eligible to become licensed physicians. *See* AAMC, *American Medical College Application Service (AMCAS)*, https://students-residents.aamc.org/applying-medical-school-amcas/american-medical-college-application-service-amcas, cited in Compl. ¶ 32 n.6; *see also, e.g.*, D.C. Code § 3-1205.22 (2025) (requiring a criminal background check before any medical license is granted). In addition, America's medical schools have "scarce resources" to sustain their core "missions of patient care, physician training, and medical research." 15 U.S.C. § 37b(a)(1)(E). Thus, the federal government regulates and funds medical residency programs through Medicare. *See, e.g.*, 42 U.S.C. § 256h (funding teaching health centers that operate graduate medical education programs).

---

[1] This Motion accepts the Complaint's factual allegations as true, as the law requires. *See, e.g.*, *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 892 F.3d 332, 338 (D.C. Cir. 2018). AAMC does not otherwise concede their accuracy.

[2] *See, e.g.*, D.C. Mun. Reg. tit. 17, § 4600 (2025) *et seq.* (setting forth educational and training requirements, board certification procedures, standards of conduct, physician discipline processes, and continuing education requirements for physicians practicing in the District of Columbia).

## II.    The Association of American Medical Colleges

AAMC is a not-for-profit membership corporation. Compl. ¶¶ 18–19. Its member institutions include at least 160 accredited U.S. medical schools, in addition to academic health systems, teaching hospitals, and academic societies. *Id*. ¶¶ 6, 19. AAMC is incorporated under Illinois law and is "recognized as a not-for-profit membership corporation under 26 U.S.C. § 501(c)(3)." *Id*. ¶ 18.

AAMC offers several products and services that are central to U.S. medical education. *Id*. ¶ 28 n.5. One of those products is AMCAS—"a suite of software to process electronic applications" to U.S. medical schools. *Id*. ¶ 31.

## III.    Application Software Provided to Member Medical Schools

AMCAS allows participating medical schools to offer applicants the option to submit a single application to multiple medical schools. Compl. ¶¶ 2, 26. Rather than submitting individual, school-specific applications directly to each school, applicants complete a single "Primary Application." *Id*. Applicants may then submit that single Primary Application to as many of the AAMC member medical schools that have chosen to use AMCAS as the applicants wish. *Id*. At that stage, if a school is interested in an applicant, the school may send the applicant a school-specific "Secondary Application" to obtain additional information requested by the school. *Id*.

The AMCAS Primary Application contains standardized information that medical schools need to receive from prospective students, such as background information, transcripts and test scores, descriptions of prior work experience, and letters of evaluation. *Id*. ¶¶ 2, 25, 32, 53, 60, 83. AMCAS then performs several "general processing features" on the submitted information, such as compiling GPA data for each applicant allowing medical schools to fairly compare the academic records of applicants who attended different schools. *Id*. ¶¶ 53, 75; *see also* AAMC, *American Medical College Application Service (AMCAS)*, https://students-residents.aamc.org/applying-

5

medical-school-amcas/american-medical-college-application-service-amcas, cited in Compl. ¶ 32 n.6 (providing background check services for member schools). Once an application is processed, AMCAS allows all the participating schools to which the individual applied to review and process the application. *Id*. ¶¶ 2, 31, 38. Primary Applications cost $175 for the first application and $47 for each additional application. *Id*. ¶ 3. There is, however, a need-based Fee Assistance Program for applicants that waives all application fees for eligible individuals for up to 20 medical school submissions. *Id*. ¶ 33; AAMC, *AMCAS*, https://students-residents. aamc.org/applying-medical-school-amcas/about-amcas-program, cited in Compl. ¶ 32 n.6.

"After a medical school receives a Primary Application, it may invite the applicant to submit a Secondary Application through the school." *Id*. ¶ 2. The Secondary Application is school-specific and "collect[s] distinct and varied information such as school-specific essays." *Id*. ¶ 83. Schools independently may require applicants to pay secondary application fees, which "generally range from $30-200 and are paid directly to the schools." *Id*. ¶ 37.

AAMC does not require its member schools to use AMCAS as their admissions application processing software. *See id*. ¶¶ 30, 81 (acknowledging that not all AAMC member schools use AMCAS). For example, most Texas medical schools require applicants to apply through a Texas-specific application system that allows those applicants to submit a common application to those schools. *Id*. ¶ 80 (describing the Texas Medical and Dental Schools Application Service (TMDSAS)). Additionally, CUNY School of Medicine uses a school-specific application. *See* AAMC, *Medical School Admission Requirements (MSAR) Report for Applicants and Advisors: Primary Application Information 2026*, https://students-residents.aamc.org/system/files/2025-07/MSAR005%20-%20MSAR%20Primary%20Application_0.pdf, cited in Compl. ¶ 7 n.2.

The average medical school applicant applies to more than 18 medical schools per application cycle. *Id*. ¶ 3. Thus, the AMCAS process saves medical school applicants a significant amount of time—e.g., the dozens of extra hours required to re-enter the same information across multiple school-specific applications or platforms, as is the case for business school applicants. *See id*. ¶ 60 ("graduate business schools each have their own applications and associated fees").

## IV.    Plaintiff's Claims

The Complaint asserts four claims against AAMC related to AMCAS under federal antitrust and state law.

**Price Fixing.** Counts I and II of the Complaint challenge AMCAS's uniform primary application fees as a *per se* illegal price-fixing agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Compl. ¶¶ 102–45. Specifically, Plaintiff claims that AAMC and its member medical schools have conspired to fix primary application fees. Count I alleges that the uniform primary application fees restrain competition in "the market for providing students with the education for a medical doctor degree" (the "Medical Doctor Education Market"). *Id*. ¶ 71. And Count II alleges that the uniform primary application fees restrain competition in the "the market for a platform to handle primary applications to medical school" (the "Medical School Primary Application Platform Market"). *Id.* Both counts allege that AAMC acted as a "hub" that facilitated a price-fixing conspiracy among member schools, i.e., the "spokes." *Id*. ¶¶ 113, 135.

**Monopolization.** Count III asserts that AAMC has monopolized the putative Medical School Primary Application Platform Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id*. ¶¶ 146–57. AAMC has allegedly acquired and maintained market share exceeding 90% in the putative market by offering AMCAS for free to member schools and reaching "*de facto* exclusive agreements" with each participating member school. *Id*. ¶¶ 148–52.

**Unconscionability.** Count IV asserts that the uniform primary application fees—$175 for the first application and $47 for each additional application—amount to an unconscionable and unfair trade practice, in violation of D.C. Code § 28-3904. *Id.* ¶¶ 3, 158–68.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Under this standard, factual allegations must "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

A pleading must offer more than "labels and conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). The Court must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" through the expense of discovery. *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

In reviewing this Motion to Dismiss, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

**I.    Counts I and II Fail Because the Complaint Alleges AMCAS Is in Substance a Joint Venture, so Its Price-Setting Is Not *Per Se* Illegal Under the Sherman Act.**

Counts I and II challenge an alleged "hub-and-spoke" price-fixing agreement between AAMC and its member schools, which the Complaint contends is "a *per se* violation of the Sherman Act." Compl. ¶¶ 113, 118, 135, 142. This claim fails as a matter of law because the Complaint alleges that AAMC and member schools collaborate on the creation and pricing of AMCAS, making it a classic joint venture under antitrust law. Under *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), a joint venture's price-setting for its products is not a *per se* violation of the Sherman Act. And Plaintiff fails to plausibly plead any facts supporting a rule-of-reason claim against AMCAS. Both Counts' price-fixing claims should therefore be dismissed.

### A.    Multi-Firm Collaboration to Offer a Product Is a Well-Recognized Form of Joint Venture Under the Antitrust Laws.

"A joint venture is a form of organization in which two or more firms agree to cooperate in producing some input that they would otherwise have produced individually, acquired on the market, or perhaps would have done without." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 2100a (5th ed. 2023) (hereinafter Areeda & Hovenkamp).[3] One well-recognized type of joint venture is a collaboration among firms to offer a product. *See, e.g.*, *Broad. Music, Inc. v. Colum. Broadcast. Sys., Inc.*, 441 U.S. 1, 18–23 (1979) (joint ventures by associations of composers and publishing companies to issue blanket licenses covering all members' copyrighted compositions); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 199 (2010) (a joint venture involves "multiple sources of economic

---

[3] Courts routinely rely on the Areeda and Hovenkamp treatise in antitrust decisions. *See, e.g.*, *Apple Inc. v. Pepper*, 587 U.S. 273, 283 (2019) ("[a] leading antitrust treatise"); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 673 (D.C. Cir. 2005) ("a leading treatise"); *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 24 (D.D.C. 2021) ("the leading treatise").

power cooperating to produce a product"). This type of collaboration involves firms pooling their resources to develop a good or service through a separate legal entity that the firms jointly control. *See, e.g., Broad. Music*, 441 U.S. at 21–22 (blanket license was a new product "composed of the individual compositions plus the aggregating service").

As the Supreme Court has recognized, joint ventures "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). Unlike a merger, which "eliminates one of the participating corporations from the market," "a joint venture creates a new competitive force therein." *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964). And when they offer a product that no single firm could develop on its own, joint ventures are able to "reap[] otherwise unattainable efficiencies." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984) (quoting *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 365 (1982) (Powell, J., dissenting)); *see also, e.g., NCAA v. Alston*, 594 U.S. 69, 88 (2021) ("There's no question . . . that many 'joint ventures are calculated to enable firms to do something more cheaply or better than they did it before.'" (quoting 13 Areeda & Hovenkamp ¶ 2100c, at 7)). For instance, "[i]n *Broadcast Music*, the availability of a package product that no individual could offer enhanced the total volume of music that was sold." *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 114. By "enabling a superior product or service," in other words, a joint venture "produces a public benefit." Areeda & Hovenkamp ¶ 2121b. For this reason, antitrust analysis of joint ventures "generally begins . . . with a presumption of legality." *Id.*

**B.    The Complaint's Allegations Establish AMCAS Is a Joint Venture.**

Although the Complaint strenuously avoids the term "joint venture," the Sherman "Act 'is aimed at substance rather than form,'" *Am. Needle*, 560 U.S. at 193 (quoting *United States v. Yellow Cab Co.*, 332 U.S. 218, 227 (1947)). The Complaint's allegations confirm that AMCAS

is in substance a joint venture under the Sherman Act involving AAMC and its member medical schools.

The Complaint alleges that "Member Medical Schools directed AAMC to develop" AMCAS: "a suite of software to process electronic applications," which "comprises both applicant-facing and Member Medical School-facing elements." Compl. ¶ 31. AAMC is "a separate legal entity from" its member medical schools. *Id*. ¶¶ 18, 110. But the "Member Medical Schools direct the features, structure, services, and other aspects of AMCAS" and "control AAMC's development of the AMCAS Primary Application." *Id.* ¶¶ 27, 29. AMCAS then "provide[s] the Primary Application Platform that the schools use at no cost," allowing them "to review and process [the] applications." *Id.* ¶ 38. In other words, according to the Complaint, the Member Medical Schools have cooperated through AAMC to create and offer a product for their own use: the AMCAS "suite of software to process electronic applications." *Id.* ¶ 31; *see also id.* ¶ 81 ("Nearly all of the Member Medical Schools have chosen to use AAMC's Primary Application Platform.").

As a joint venture, AMCAS exhibits the type of efficiencies and procompetitive benefits that can be achieved only through collaboration. Individual medical schools could not offer applicants a single primary application or provide themselves with joint application processing software without collaboration. Absent the joint venture, each medical school would have a separate software system, requiring each applicant to input and transmit the same information repeatedly into an average of more than 18 different systems, Compl. ¶ 3, and each medical school to attempt to tailor that information to the unique requirements of medical education. *See, e.g.*, Compl. ¶¶ 60–62 (alleging graduate business schools lack a centralized application processing system and at least one "uses the same application software for its business school as it does for

all other graduate programs"). By collaborating, on the other hand, AAMC and its participating member schools have developed a product that benefits both students and medical schools. AMCAS benefits schools by streamlining the application review process, standardizing the collection of applicant data, and verifying application materials—benefits much like the "integration of sales, monitoring and enforcement against unauthorized copyright use" made possible by the blanket license in *Broadcast Music*, 441 U.S. at 20. And just as the blanket license gave copyright users easy and immediate "access to any and all of the repertory of compositions," *id.*, AMCAS increases overall output by making it easier for students to submit applications to multiple schools and easier for medical schools to review the increased volume of applications. Thus, as in *Broadcast Music*, "the whole is truly greater than the sum of its parts." 441 U.S. at 21–22.

### C. As Price-Setting by a Joint Venture, AMCAS's Uniform Pricing Is Not *Per Se* Illegal Under the Sherman Act.

Because the Complaint substantively pleads that AMCAS is a joint venture, binding Supreme Court precedent forecloses Plaintiff's *per se* price-fixing claims under Section 1 of the Sherman Act (Counts I and II). Under *Dagher*, "the pricing decisions of a legitimate joint venture do not fall within the narrow category of activity that is *per se* unlawful under § 1 of the Sherman Act, [so Plaintiff's] antitrust claim[s] cannot prevail." 547 U.S. at 8.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "Despite (or rather, because of) this provision's extraordinary breadth, the Supreme Court 'has never taken a literal approach to [its] language.'" *Gross v. Wright*, 185 F. Supp. 3d 39, 48 (D.D.C. 2016) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007)). "Instead, the Court has 'long recognized that Congress intended to outlaw only

unreasonable restraints.'" *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1." *Leegin*, 551 U.S. at 885.

Plaintiff asserts "a *per se* violation of the Sherman Act." Compl. ¶¶ 118, 142. But "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886–87 (internal citations omitted). "Recognizing the inherent limits on a court's ability to master an entire industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements," *Alston*, 594 U.S. at 89, the Supreme Court has "expressed reluctance to adopt *per se* rules with regard to 'restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious,'" *Khan*, 522 U.S. at 10 (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458–59 (1986)).

In *Dagher*, the Supreme Court specifically considered "the extent to which the *per se* rule against price fixing applies to an important and increasingly popular form of business organization, the joint venture." 547 U.S. at 5. *Dagher* involved a joint venture formed by two previously competing oil companies, Texaco and Shell Oil, "to refine and sell gasoline in the western United States under the original Texaco and Shell Oil brand names." *Id.* at 3–4. A class of Texaco and Shell Oil service station owners challenged the joint venture's price-setting under Section 1 of the Sherman Act, alleging the two companies "engaged in unlawful price fixing when [their joint venture] set a single price for both Texaco and Shell Oil brand gasoline." *Id.* at 3. The Supreme Court rejected that claim and the application of the *per se* rule. *Id.* at 7–8.

The Supreme Court explained "it would be inconsistent with this Court's antitrust

13

precedents to condemn the internal pricing decisions of a legitimate joint venture as *per se* unlawful." *Id.* at 7. Thus, "most joint venture restrictions . . . are subject to the rule of reason," though some are "so obviously incapable of harming competition that they require little scrutiny" and "win antitrust approval in the 'twinkling of an eye.'" *Alston*, 594 U.S. at 88, 90 (quoting *Am. Needle*, 560 U.S. at 203).

The *per se* rule does not apply to AMCAS's uniform pricing. As in *Dagher*, "the pricing policy challenged here amounts to little more than price setting by a single entity—albeit within the context of a joint venture—and not a pricing agreement between competing entities with respect to their competing products." 547 U.S. at 6. The member medical schools created the alleged joint venture to offer "a suite of software to process electronic applications." Compl. ¶ 31. In offering the Primary Application through AMCAS, AAMC necessarily established a pricing structure for its product. *See id.* ¶¶ 33–34 (detailing the Primary Application fees charged for AMCAS since 2022); *cf. Broad. Music*, 441 U.S. at 21 ("a necessary consequence of an aggregate license is that its price must be established"). According to the Complaint, the joint venture chose to offer the AMCAS product (i.e., processing software) for free to the medical schools and charge applicants a fee for submitting primary applications.[4] Based on the Complaint's own allegations, "the business practice being challenged involves the core activity of the joint venture itself— namely, the pricing of the very good[] produced and sold by" the joint venture. *Dagher*, 547 U.S. at 7–8. As *Dagher* observed, echoing the dissent to the Ninth Circuit decision it reversed, "What could be more integral to the running of a business than setting a price for its goods and services?"

---

[4] As explained *infra* pp. 18–19, medical schools, not applicants, are the relevant consumers of the AMCAS product (i.e., software), while applicants are the relevant consumers of the medical doctor education they seek to acquire by submitting primary applications. But the joint venture sets the prices at issue in both relevant markets, so *Dagher* forecloses application of the *per se* rule to Counts I and II regardless of the distinction between relevant consumers.

14

*Id.* at 8 (quoting *Dagher v. Saudi Refin., Inc.*, 369 F.3d 1108, 1127 (9th Cir. 2004) (Fernandez, J., dissenting)).

Thus, even if AMCAS's "pricing policy may be price fixing in a literal sense, it is not price fixing in the antitrust sense." *Dagher*, 547 U.S. at 7; *cf. Broad. Music*, 441 U.S. at 9 ("When two partners set the price of their goods or services they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act."). The Complaint's claim that AMCAS's uniform price-setting is *per se* illegal accordingly fails under binding precedent. This claim can and should be dismissed now, because Plaintiff's allegations make clear that, as in *Dagher*, AMCAS's price-setting is a core activity of the joint venture. *See Oliver v. SD-3C LLC*, 2015 WL 10890656, at *4 (N.D. Cal. Sept. 30, 2015) (dismissing Section 1 price-fixing claim against joint venture where relevant allegations "ma[de] clear" that the price restriction at issue was a "core activity" of the joint venture); *see also, e.g.*, *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 467 (S.D.N.Y. 2017) (dismissing *per se* Section 1 claim, because "viewing the operation of a legitimate joint venture as akin to that of a single firm, modern antitrust law evaluates such joint conduct—including the creation of the joint venture itself, its business focus, its product selection, and its pricing—under the rule of reason, with the pleading requirements that standard imposes").

### D. The Complaint Fails to Plausibly Allege the AMCAS Joint Venture Is Illegal Under the Rule of Reason.

The Complaint makes a conclusory reference to the rule of reason: "Given the lack of procompetitive benefits or justification, the price fixing is also necessarily a violation of the Sherman Act according to the Rule of Reason." Compl. ¶¶ 118, 142. But this threadbare allegation cannot rescue Counts I and II.

The rule of reason requires a plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Dagher*,

547 U.S. at 5. "A demonstration of market power alone is not sufficient; plaintiffs must also show that the challenged practice is likely to harm competition." *In re McCormick & Co.*, 217 F. Supp. 3d 124, 137 (D.D.C. 2016). A plaintiff can satisfy this burden through direct evidence of anticompetitive effects, "such as reduced output, increased prices, or decreased quality in the relevant market," or indirect evidence, meaning "proof of market power plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co. (Amex)*, 585 U.S. 529, 542 (2018). "Because anticompetitive effect is an essential element of a claim under the rule of reason, plaintiffs must plausibly allege it in their complaint." *McCormick*, 217 F. Supp. 3d at 137.

The Complaint falls far short of plausibly alleging a rule-of-reason claim. Most importantly, the conclusory allegation that AMCAS's "price fixing" is unlawful according to the rule of reason ignores the fact that a joint venture's price-setting simply "is not price fixing in the antitrust sense." *Dagher*, 547 U.S. at 6. Even if that were not decisive—and it is—the Complaint would still fail under the rule of reason because there are no factual allegations that AMCAS's price-setting for its joint venture product has harmed competition in the markets alleged. The Complaint cursorily alleges that fees charged to applicants to submit primary applications via AMCAS are "supracompetitive." Compl. ¶¶ 121, 145. But "[c]onclusory allegations of supracompetitive prices are not sufficient" to plead anticompetitive effect. *McCormick*, 217 F. Supp. 3d at 137. And the Complaint's assertions that AMCAS lacks "procompetitive benefits," Compl. ¶¶ 118, 119, 142, 143, are also purely conclusory—and contradicted by factual allegations that AMCAS expands output in both putative markets by facilitating the submission and review of more primary applications, *see, e.g.*, *id.* ¶¶ 2, 26, 32. The Complaint fails to plausibly allege "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market[s]." *Amex*, 585 U.S. at 541.

16

Absent concrete factual allegations demonstrating anticompetitive effects from the AMCAS joint venture, Counts I and II do not state an antitrust claim under the rule of reason. *See, e.g.*, *McCormick*, 217 F. Supp. 3d at 139 (dismissing Section 1 claim where plaintiffs "failed to offer any facts or argument plausibly suggesting that the agreement [was] anticompetitive"); *Gross*, 185 F. Supp. 3d at 53 ("The case law is clear . . . that an absence of factual allegations tending to show that the 'market as a whole has suffered an anti-competitive injury' is 'fatal to . . . Sherman Act claims.'" (quoting *Asa Accugrade, Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 216 (D.D.C. 2005))); *Interest Rate Swaps*, 261 F. Supp. 3d at 468 (dismissing Section 1 claim where complaint "fail[ed] to plead facts sufficient to support the conclusion that, evaluated under rule-of-reason methodology, the [challenged] joint venture . . . represented an unreasonable restraint of trade").

## II. Counts II and III Independently Fail Because Plaintiff Lacks Antitrust Standing to Bring Antitrust Claims Related to the Putative "Medical School Primary Application Platform Market."

Counts II (Price Fixing) and III (Monopolization) rely on purported harms to competition in the "Medical School Primary Application Platform Market." But Plaintiff lacks antitrust standing to challenge the alleged anticompetitive conduct in that putative market because she is not a purchaser of the relevant product alleged in the Complaint—application processing software. Because this defect is incurable, Counts II and III should be dismissed with prejudice.

A private plaintiff asserting a federal antitrust claim must plausibly plead "antitrust injury to establish its standing to sue." *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 43 (D.D.C. 2024). "While Article III standing is a familiar concept common to all cases, antitrust standing is claim-specific." *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 981 (D.C. Cir. 2017). "It asks 'whether the plaintiff is a proper party to bring a private antitrust action.'" *Id.* (quoting *Associated Gen. Contractors of Cal.*, 459 U.S. at 535 n.31). As relevant here, antitrust

17

standing requires a plaintiff to be "a participant in the relevant market and [to have] 'suffered its injury in the market where competition is being restrained.'" *Fotobom*, 719 F. Supp. 3d at 44 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)); *see also, e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 38 (D.D.C. 2003) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." (quoting *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999))); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury.").

Plaintiff fails to satisfy the antitrust standing requirement with respect to the putative Medical School Primary Application Platform Market (the "Platform Market") for Counts II and III, as she is not a participant in the alleged relevant market and thus not injured in that market. The Complaint pleads that the Platform Market "is the market for a *platform to handle* primary applications to U.S. medical schools"—*not* a market in which medical schools are competing for applicants or their applications. Compl. ¶ 79 (emphasis added); *cf. id.* ¶ 73 (alleging the putative "Medical Doctor Education Market" involves competition "for applicants to medical school"). The putative Platform Market allegedly "includes" AMCAS and alternative "application platforms used by the less than 10% of U.S. medical schools that do not use" AMCAS, which "include the Texas Medical and Dental Schools Application Service ('TMDSAS')." *Id.* ¶¶ 79–80. These allegations confirm the putative Platform Market is a *software* market. *See id.* Indeed, AMCAS—the alleged "Primary Application Platform"—is "a suite of *software* to process electronic applications." *Id.* ¶ 31 (emphasis added). The relevant competitors in that market are software providers (including AMCAS), and the relevant consumers are the medical schools that choose

which software to use. *See, e.g.*, *id.* ¶ 81 ("Nearly all of the Member Medical Schools *have chosen to use* AAMC's Primary Application Platform [AMCAS]." (emphasis added)). The Complaint further confirms this point by measuring AAMC's "market share" based on the share of *schools* ("exceeding 90%") that have chosen to use AMCAS for their primary applications. *Id.* ¶ 148.

Medical school applicants are not competitors in this putative market—they are not in the business of developing or offering software to handle primary medical school applications. Nor are applicants the relevant consumers in this market because they do not choose or buy the software itself—the medical schools do. *See, e.g.*, *id.* ¶¶ 79, 81. To be sure, medical school applicants *use* primary application platforms to submit their primary applications. *E.g.*, *id.* ¶ 32. But they do not choose the platform that they would like to use, nor do they have any say over whether and how to use the platform. *E.g.*, *id.* For that reason, they are not an injured party within this market (as opposed to the separate Medical Doctor Education Market). *See, e.g.*, *Fotobom*, 719 F. Supp. 3d at 48 (dismissing counts where plaintiffs failed to "demonstrate[] the requisite antitrust injury to bring claims in the market" alleged); *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 19 (D.D.C. 2025) (granting motion to dismiss where "there [was] a mismatch between the market allegedly controlled by [defendant] and the market where [plaintiff was] allegedly injured").

Plaintiff cannot circumvent her lack of standing by recasting this software market as a "two-sided platform" market in which she would be a customer with standing. The paradigmatic two-sided platform market is the credit-card market analyzed by the Supreme Court in *Amex*. In the credit-card market, *Amex* explained, there are two sets of customers: consumers who choose to use credit cards and merchants who decide which credit cards to accept for payment. 585 U.S. at 534. But the Complaint does not plausibly allege that the Primary Application Platform Market is a two-sided market like the platform market in *Amex*. In the credit-card market, the relevant

product is the credit-card transaction itself, and "no credit-card transaction can occur unless both the merchant and the cardholder simultaneously agree to use the same credit-card network." *Id.* at 535. Here, by contrast, the product is the processing software—not a transaction between the schools and applicants. *See, e.g.*, Compl. ¶¶ 79, 81. And, unlike a two-sided credit-card transaction, the processing software is chosen solely by the medical schools. *See, e.g., id.* ¶¶ 31–32. The applicants are not buyers or sellers of the software itself any more than they would be buyers or sellers of a medical school's classrooms, laboratories, and laboratory equipment. They may use all those things in pursuit of a medical education—the relevant product they may buy and pay for— but that does not transform classrooms, laboratories, and laboratory equipment into two-sided markets in which the applicants would have standing to sue builders and equipment manufacturers for antitrust violations.

Even if the putative market were plausibly two-sided—which it is not—the Complaint fails to allege anticompetitive harm on *both* sides of the market, as required by *Amex*. With respect to two-sided transaction platforms, the Supreme Court held that it is necessary to evaluate both sides of the market "to accurately assess competition." *Id.* at 546. Indeed, "competition cannot be accurately assessed by looking at only one side of the platform in isolation." *Id.* Against that backdrop, the Supreme Court held that the plaintiffs in *Amex* failed to satisfy their burden to show anticompetitive effects because they "stake[d] their entire case on proving that Amex's agreements increase[d] merchant fees," neglecting to establish that the provisions negatively impacted cardholders or inflated the price of credit-card transactions beyond "the price one would expect to find in a competitive market." *Id.* at 547–48. To the extent it even attempts to allege a two-sided platform market, the Complaint here makes the same mistake: Plaintiff "focuses on only one side" of the market, alleging harm only to medical school applicants. *Id.* at 547. In fact, the Complaint

admits that member medical schools "receive substantial benefits" in the market. Compl. ¶ 45. This failure to allege anticompetitive effects on the market "as a whole" forecloses any two-sided market claim. *Amex*, 585 U.S. at 547; *see also id.* ("Evidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power.").

The Complaint accordingly fails to plead antitrust standing for Counts II and III.   This deficiency cannot be cured, requiring dismissal of the claims with prejudice.

## III.    Count III Independently Fails Because There Is No Plausible Allegation of Exclusionary Conduct.

Count III alleges that AAMC has unlawfully monopolized the Medical School Primary Application Platform Market solely because it has "acquired and maintained a market share exceeding 90%, which forecloses that substantial share of the market from the many potential competitors." Compl. ¶ 148. But a high market share alone is not enough to state a plausible monopolization claim under Section 2 of the Sherman Act. *See, e.g.*, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP* (*Trinko*), 540 U.S. 398, 407 (2004). The Complaint must plead plausible exclusionary conduct to support its Section 2 claim, but it does not to do so and thus fails to state a claim.

### A.    A Section 2 Claim Requires Plausibly Pleading Exclusionary Conduct.

"Section 2 of the Sherman Act makes it unlawful for a firm to 'monopolize.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (quoting 15 U.S.C. § 2). "It is settled law," however, "that the mere existence of a monopoly does not violate the Sherman Act." *Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008). In addition to the possession of monopoly power, a plaintiff asserting a Section 2 claim must plead that a defendant has "engag[ed] in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product,

21

business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)); *see also Trinko*, 540 U.S. at 407 ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."). "[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect'"—"[t]hat is, it must harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58. A "court must 'disaggregate [putative] exclusionary conduct into its component parts before applying the relevant law.'" *United States v. Google LLC*, 687 F. Supp. 3d 48, 70 (D.D.C. 2023) (quoting *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022)). A complaint's failure to adequately allege exclusionary conduct requires dismissal. *See, e.g.*, *Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 152–53 (D.D.C. 2008) (granting motion to dismiss where complaint failed to plead "facts that support[ed] a reasonable inference that . . . [defendant] engaged in exclusionary conduct").

## B.  The Complaint's Predatory-Pricing Allegation Fails.

The Complaint first attempts to plead exclusionary conduct by alleging that "AAMC has constructed illegitimate and insurmountable barriers to entry for competitors" by "using the revenue from the price-fixed Primary Application fee to provide its service . . . for free to medical schools." Compl. ¶ 150. To qualify as exclusionary conduct, that allegation would have to satisfy the well-established test for predatory pricing. It fails to do so.

A claim that a price—here, the cost of AMCAS to schools—is "unlawfully low, or 'predatory,'" is available in only "very rare circumstances." *Microsoft*, 253 F.3d at 68. That is because an erroneous finding of predatory pricing "chill[s] the very conduct the antitrust laws are designed to protect": competition through low prices. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S.

104, 122 n.17 (1986)); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc. (linkLine)*, 555 U.S. 438, 451 (2009) ("[C]utting prices in order to increase business often is the very essence of competition." (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986))); *Dial a Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 487 (D.C. Cir. 1996) ("Predatory pricing claims, because they are premised on a temporary increase in competition, inherently ask the court to penalize potentially beneficial conduct.").

"To avoid chilling aggressive price competition, [the Supreme Court has] carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low." *linkLine*, 555 U.S. at 451. Merely labeling low prices as a "barrier[] to entry," as the Complaint does, Compl. ¶ 150, is insufficient because barriers to entry cannot themselves establish that a defendant has "engag[ed] in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (quoting *Grinnell*, 384 U.S. at 571). Instead, to establish predatory pricing, a plaintiff must allege both that the challenged price is below cost and that a defendant is able to recoup its losses from the below-cost pricing by later raising prices above a competitive level. *See Brooke*, 509 U.S. at 222–24. "Without [recoupment], predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." *Id.* at 224; *see also United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 982 (7th Cir. 2025) ("The recoupment requirement ensures that any antitrust claim based on low prices involves harm to consumers through eventual high prices.").

The Complaint does not satisfy any of the requirements for predatory pricing. It suggests that offering AMCAS to medical schools for free is predatory because schools do not have any economic incentive to use a competing application platform. Compl. ¶ 150. But the Complaint

nowhere alleges that AAMC has priced AMCAS to medical schools—the relevant consumers in this market, *supra* pp. 18–19—below cost in the short run to recoup profits in the long run. To the contrary, the Complaint alleges that AMCAS's low (free) price to the consumers in the Medical School Primary Application Platform Market (i.e., to the schools) makes both short-term and long-term economic sense because AMCAS charges fees to different consumers in a different market (i.e., applicants in the Medical Doctor Education Market). *See* Compl. ¶ 150. And any fees charged in a different market (i.e., the Medical Doctor Education Market) do not constitute exclusionary conduct because they do not harm the competitive process in the relevant market (i.e., the Medical School Primary Application Platform Market). "[O]btain[ing] higher prices normally has no particular tendency to exclude rivals and thus to diminish competition." *Rambus*, 522 F.3d at 464; *see also id.* ("Even if [challenged conduct] raises the price secured by a seller, but does so without harming competition, it is beyond the antitrust laws' reach.").[5]

Nor do Plaintiff's conclusory allegations of "kickbacks" from AAMC to the schools, Compl. ¶ 151, separately establish predatory pricing. *See Rambus*, 522 F.3d at 465–66 (citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477–78 (9th Cir. 1997), for "rejecting a claim that an insurance company's alleged kickback scheme caused antitrust injury to group health insurance customers where the evidence showed the scheme caused higher copayments and premium payments, but did 'not explain how the scheme reduced competition in the relevant market'"). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *linkLine*, 555 U.S. at 451 (quoting

---

[5] To illustrate this principle of antitrust law and economics in more practical terms, a potential application processing software competitor could compete with AMCAS using precisely the same business model the Complaint challenges: offering software to medical schools for free in order to profit from charging applicants a fee. The Complaint alleges nothing to the contrary, so it fails to show any harm to competition necessary to plead Count III.

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990)); *see also Microsoft*, 253 F.3d at 68 (holding that the court had "no warrant to condemn Microsoft for offering [Internet Explorer] . . . free of charge or even at a negative price" by "paying [internet access providers] to take it" because "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price").

Absent plausible allegations of below-cost pricing followed by recoupment within the relevant market, the Complaint's objections to AMCAS's pricing structure fail to adequately allege exclusionary conduct. *See, e.g.*, *Wis. Grain Producers*, 144 F.4th at 983 (affirming dismissal of predatory-pricing claim where plaintiff "failed to plead recoupment by way of monopoly prices"); *Dial a Car*, 82 F.3d at 488 (same where "there [was] no basis for believing that either [defendant] could sustain its monopoly price once it raised prices").

## C.    The Complaint's "*De Facto* Exclusive Agreement" Allegation Fails.

The Complaint also cursorily asserts that AAMC engaged in exclusionary conduct by entering "*de facto* exclusive agreements" with the member medical schools, Compl. ¶ 152, but this attempt to plead exclusionary conduct fares no better. The Complaint's factual allegations regarding exclusivity fall far short of established standards for plausibly alleging exclusionary agreements.

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *EpiPen*, 44 F.4th at 982 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012)). While exclusive agreements can be exclusionary, "[m]erely categorizing [an agreement] as 'exclusive' does not answer the question of whether [it] violate[s] Section 2." *United States v. Google LLC*, 747 F. Supp. 3d 1, 152 (D.D.C. 2024). "That is because exclusive agreements are not condemned per se by the antitrust laws, even if they involve a dominant firm." *Id.* "Courts repeatedly explain

25

that exclusive dealing agreements are often entered into for entirely procompetitive reasons and pose very little threat to competition even when utilized by a monopolist." *EpiPen*, 44 F.4th at 983. Indeed, "[e]xclusive deals tend to create efficiencies far more often than they inflict consumer harm." *Id.* at 996.

Against that backdrop, courts hold that "[a]n exclusive agreement violates the Sherman Act only when its 'probable effect is to foreclose competition in a substantial share of the line of commerce affected.'" *Google*, 747 F. Supp. 3d at 153 (quoting *Microsoft*, 253 F.3d at 79). In assessing whether that standard is met, courts consider the percentage of the relevant market foreclosed, as well as "qualitative conditions" relevant to "the durability of market foreclosure at a given time." *Id.* at 157. "Such qualitative conditions include the duration of the exclusive agreements, their ease of terminability, the height of barriers to entry, the availability of alternative methods of distribution, and the willingness of consumers to comparison shop." *Id.* "Substantial foreclosure is a prerequisite for every exclusive-dealing Section 2 claim." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 530 (5th Cir. 2022).

Here, the Complaint includes none of the necessary factual allegations to plead substantial foreclosure through exclusive dealing. To begin, the Complaint does not plead any facts regarding the purported exclusive agreements; the allegation of "*de facto* exclusive agreements," Compl. ¶ 152, is thus a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," which "do[es] not suffice" under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678. Indeed, the factual allegations in the Complaint disprove the allegations of exclusive agreements, as the Complaint acknowledges that some AAMC members do not use AMCAS. Compl. ¶ 80. And the schools that use AMCAS have made their own choice to do so. *Id.* ¶¶ 7, 30, 153; *see EpiPen*, 44 F.4th at 999 (holding "the district court properly considered the absence of coercion as

a factor in the exclusive dealing analysis").[6] The Complaint points to language on the AAMC website that "AAMC members have 'exclusive use' of AMCAS at no cost," Compl. ¶ 38, but that simply reflects that AAMC offers AMCAS exclusively to its members—not that members must exclusively use AMCAS for accepting primary applications (which is the only form of exclusivity that would be relevant to exclusionary conduct towards competitors). Thus, the Complaint does not even plausibly allege the existence of exclusivity agreements.

The Complaint also does not plausibly allege that the purported exclusivity agreements exclude competition. In particular, the Complaint fails to plead any facts about the alleged agreements between AAMC and the member medical schools that establish the schools are bound by the agreements, let alone any facts that could establish the extent to which they are bound. It is "axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination." *Google*, 747 F. Supp. 3d at 157 (quoting *EpiPen*, 44 F.4th at 988). Yet the Complaint here provides no details whatsoever about the alleged agreements' length, durability, or related factors. Remarkably, the Complaint does not even allege that there is anything preventing medical schools from terminating their use of AMCAS at will. The Complaint accordingly fails to plausibly plead that the agreements in fact prevent the member medical schools from using a different platform or in any way "impair [any competitor's] opportunity to compete." *EpiPen*, 44 F.4th at 988. As a result, the Complaint does not adequately allege that the alleged exclusive agreements' "probable effect is to 'foreclose competition in a substantial share'" of the relevant market. *Microsoft*, 253 F.3d at 79; *see also, e.g.*, *BRFHH Shreveport*, 49 F.4th at 531 (dismissing Section 2

---

[6] The allegation that member medical schools "require applicants to use AAMC's Primary Application Platform," Compl. ¶ 153, is an allegation about the independent choices of member *medical schools*, not of AAMC, and thus cannot establish exclusionary conduct by AAMC.

exclusive-dealing claim where plaintiffs failed to "tell a coherent story about how the [exclusive-dealing] arrangement prevented [a competitor] from providing healthcare services to any portion of the [relevant] market").

In sum, Count III independently fails because the Complaint does not plausibly allege the exclusionary conduct necessary to state a monopolization claim under Sherman Act Section 2.

## IV. Count IV Fails Because the Primary Application Fees Are Not "Consumer Transactions," the Fees Are Not Unconscionable, and the Nonprofit Safe Harbor Bars the Claim.

Count IV alleges that "AAMC charges applicants unconscionable fees for its Primary Application Platform," Compl. ¶ 162, in violation of the D.C. Consumer Protection Procedures Act (CPPA), D.C. Code § 28-3904. This add-on claim, consisting of bare sentences with no meaningful explanation, Compl. ¶¶ 158–168, ignores that AMCAS's significant value to medical schools and applicants makes its fees far from unconscionable. Count IV fails for three independent reasons. *First*, the CPPA does not apply to the alleged fees at issue because they related "primarily" to Plaintiff's "professional interests"—attending medical school to become a medical doctor—rather than "goods or services . . . for [her] personal, household, or family use." *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043–44 (D.C. Cir. 2010). *Second*, the Complaint offers no plausible allegation that AMCAS's application fees are unconscionable. *Third*, the CPPA itself bars Plaintiff's claim because the AAMC is a "nonprofit organization" and the claim relates to "membership services" and "training or credentialing." D.C. Code § 28-3905(k)(5).

### A. The CPPA Does Not Apply to the Fees Plaintiff Paid for Her Professional Purpose to Become a Medical Doctor.

The CPPA applies only to "'consumer' transactions within the meaning of the Act." *Shaw*, 605 F.3d at 1043. To qualify as a "consumer" under the CPPA, a plaintiff must be "a person who receives or demands goods or services that are primarily for personal, household, or family use."

*Id.* Like the plaintiffs in *Shaw*, Plaintiff fails this test.

Plaintiff bases her CPPA claim on fees to apply to "U.S. medical schools . . . because of [their] benefits for future employment." Compl. ¶ 74. These transactions were necessarily "intended primarily to promote business or professional interests." *Shaw* 605 F.3d at 1043. The Complaint fails to allege otherwise. There is no factual or even conclusory allegation that Plaintiff's medical school applications were "primarily for personal, household, or family use." *Id.* Instead, the Complaint repeatedly reinforces that Plaintiff's purpose for seeking an M.D. degree was a professional one. *See, e.g.*, Compl. ¶¶ 4, 76, 78, 84 (alleging medical school applicants have "aspirations to be doctors"; medical school may lead to "work in primary care medicine"; applicants favor M.D. degrees instead of D.O. degrees because it gives them a better chance of "matching to any residence [sic] program," including "the most competitive residency programs"; "other healthcare programs" are not a substitute because they "do not allow their graduates to become medical doctors"; and "[b]ecause medical school is the only available option to receive an M.D. degree, other schools are not reasonable substitutes for medical schools"). Indeed, medical school is by definition a "professional school[]." *Id.* ¶ 64.

Accordingly, the CPPA does not apply to Plaintiff's medical education for the same reason that the court in *MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 654 (6th Cir. 2013), found the analogous Michigan consumer protection statute did not apply to law school education. Plaintiff "did not attend [medical] school for personal purposes, nor for dilettantish reasons." *Id.* at 661–62. She pursued a medical "education for a business purpose, to make a living" as a medical doctor. *Id.*; *see also Qureshi v. Am. Univ.*, No. 20-cv-1141 (CRC), 2023 WL 2387811, at *7 (D.D.C. Mar. 7, 2023) (distinguishing graduate education while applying the CPPA to undergraduate "liberal arts" education); *Reynolds v. Concordia Univ.*, No. 21-CV-2560, 2022 WL

29

1323236, at *17–18 (D. Minn. May 3, 2022) (dismissing claims related to nursing education under the Oregon consumer protection statute, which like the CPPA requires "personal, family, or household use," because "[a] nursing education is ordinarily something used for 'commercial' or economic purposes—to earn a living—and this is true despite the attendant personal fulfillment or benefits it might bring").

As a result, Plaintiff "cannot state a claim" because she "engaged in no consumer transaction within the meaning of the CPPA." *Shaw*, 605 F.3d at 1044.

### B. The Complaint Fails to Plausibly Allege the Primary Application Fees that Plaintiff Paid Were "Unconscionable."

Even if the CPPA applies here, the Complaint fails to plausibly plead facts to infer the primary application fees Plaintiff paid were unconscionable. The CPPA prohibits "engaging in unfair or deceptive trade practice[s]," including "mak[ing] or enforc[ing] unconscionable terms or provisions of sales." D.C. Code § 28-3904(r). Because Count IV is predicated on a theory of unconscionably high prices, the Complaint must plausibly allege not just that Plaintiff paid high fees but that there was a "*gross disparity* between the price" she paid "and the value" she received, "measured by the price at which similar property or services are readily obtainable in transactions by like buyers." D.C. Code § 28-3904(r)(3) (emphasis added).[7] The Complaint fails to do so, offering only a bare legal conclusion contradicted by other allegations in the Complaint.

"[T]o show that a price was unconscionably high, the buyer must establish that the price was 'unreasonably favorable' to the seller (and also, almost always, that the buyer did not have a

---

[7] For purposes of this Motion only, AAMC assumes that D.C. law applies to Plaintiff's consumer protection claim based on the Complaint's lack of detail on key factors relevant to the choice-of-law analysis. *See Corp. Accountability Lab v. Sambazon, Inc.*, 340 A.3d 1277, 1293 (D.C. 2025) (holding that on a motion to dismiss "the law of the forum jurisdiction—the CPPA—applies when it is unclear which jurisdiction has a greater interest in the litigation" while "leav[ing] open the possibility that" the CPPA may not apply "after both parties have been afforded the opportunity to conduct discovery and present evidence" (internal quotation omitted)).

meaningful choice of alternatives under the circumstances).” *Ford v. ChartOne, Inc.*, 908 A.2d 72, 90 (D.C. 2006) (quoting *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983)). The Complaint fails to allege that fact, instead offering only threadbare legal conclusions that represent a quintessential failure to state a claim under *Iqbal*, 556 U.S. at 678. Critically, the Complaint contains no factual allegation demonstrating the fees Plaintiff paid were grossly disproportionate to the value she received from AMCAS's product: the ability to apply to 11 schools with a single application. *Cf.* D.C. Code § 28-3904(r)(3) (requiring a “gross disparity between the price . . . and the value”).

Plaintiff applied to 11 medical schools through AMCAS and paid an average of $57 per primary application. Compl. ¶ 85. The Complaint fails to compare AMCAS's fees with the substantial value it provides in offering a “uniform” way for applicants to apply to multiple schools at once, using standardized information that AMCAS has processed to assist those schools in comparing applicants. *Id.* ¶¶ 25–26. Instead, the only basis Count IV offers for deeming Plaintiff's $57 average AMCAS fee “unconscionable” is a bare legal conclusion that it “b[ore] no relation to the value of the Primary Application Platform, as illustrated by the prices charged for similar application platforms like the Common Application or graduate business schools.” *Id.* ¶¶ 162–63. As to Plaintiff's comparison of AMCAS's fees to the Common Application, that conclusory allegation fails because the Common Application relates to a different level of education. The Complaint fails to allege that it performs all the same functions as AMCAS, such as compiling GPA data and performing criminal background checks. *See id.* ¶¶ 32 n.6, 53. Thus, the Common Application is not a “similar” service for comparing price disparities. D.C. Code § 28-3904(r)(3). As to the comparison to graduate business school application fees, Plaintiff's conclusory allegation fails because it is contrary to other allegations in the Complaint. Notably, the Complaint alleges

that "application fees at private business schools" range from "as low as $30 per application" to "$250–$275," with at least one in the middle at "$95." Compl. ¶¶ 61, 62. There is no "gross disparity" between these fees and Plaintiff's $57 average AMCAS fee. D.C. Code § 28-3904(r)(3); *see Lund v. Watergate Invs. Ltd.*, 728 A.2d 77, 85 (D.C. 1999) (holding there was no gross disparity between $434 parking fee and fees for comparable parking totaling $160 or $320).[8]

Unable to allege a gross disparity in value, the Complaint resorts to another conclusory allegation: that AMCAS fees "bear no relation to the actual cost of the Primary Application Platform." *Id.* ¶ 164. But the Complaint fails to allege facts about AAMC's "*average* costs" as the CPPA requires. *Ford*, 908 A.2d at 91. "The question of whether a uniform price is unreasonably favorable to the seller, *i.e.*, enables the seller to reap an exorbitant, non-competitive return, . . . cannot be answered one transaction at a time by comparing the uniform fees charged in each transaction with the actual, fluctuating costs allocable to that transaction." *Id.* The Complaint is silent on the average costs of the many features AMCAS provides, such as the costs of compiling GPA data and performing criminal background checks averaged across applications and the costs of creating, maintaining, and updating the software averaged across applications. *See supra* pp. 5–7.

In sum, "the plaintiff has baldly asserted unconscionability without providing any factual allegations that would permit the Court to draw such an inference. Therefore, this count does not state a claim." *Carter v. Bank of Am., N.A.*, 888 F. Supp. 2d 1, 17 (D.D.C. 2012); *see also, e.g., In*

---

[8] The Complaint also alleges that AAMC deceived Plaintiff by "concealing the true value" of the services provided. Compl. ¶ 167. That allegation is purely conclusory. Moreover, the sole basis for that allegation is the premise that the price is grossly disproportionate to the value, and as discussed, the Complaint fails to allege that the fees charged are grossly disproportionate to the value received. Equally fatal, the Complaint fails to allege knowing "the true value," *id.*, would have any bearing on Plaintiff's decision or the fees she paid, so the Complaint fails to plead materiality. The Complaint fails to state any claim under the CPPA for deception.

*re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007) (dismissing CPPA claim where "plaintiffs argue[d] that they . . . pleaded that defendants engaged in unconscionable conduct" but "[t]hey ha[d] not, however, pleaded the kind of grossly unequal bargaining power prohibited by the[ CPPA]").

### C.    The CPPA's Nonprofit Safe Harbor Bars Count IV Because the Claim Arises from Nonprofit Membership, Training, and Credentialing.

Count IV independently fails because the CPPA's nonprofit safe harbor applies here. "An action brought by a person under this subsection against a nonprofit organization shall not be based on . . . membership services, training or credentialing activities, . . . or any other transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business." D.C. Code § 28-3905(k)(5). AAMC is a nonprofit organization under the CPPA. *See id.* § 28-3901(a)(14); Compl. ¶¶ 8, 10. And the nonprofit safe harbor bars Count IV for two separate reasons: the claim is based on (1) membership services and (2) training and credentialing activities.

*First*, the Complaint alleges AMCAS is a membership service: "AAMC members have 'exclusive use' of AMCAS at no cost, and . . . the services 'replace costly administrative and personnel expenses for [the member] medical school[s].'" Compl. ¶ 38. Plaintiff's claim directly challenging AMCAS is thus "based on . . . membership services." D.C. Code § 28-3905(k)(5). Even excluding references to class members, the words "member," "members," or "membership" still appear over 100 times in the Complaint. *See generally* Compl. Count IV, along with the entire Complaint, challenges AMCAS's fee structure, specifically targeting its availability "at no cost" to "AAMC members." *Id.* ¶ 38. This fee structure exists, according to the Complaint, at "[t]he Member Medical Schools' direction." *Id.* ¶ 39. And the fee structure yields "incentives provided to Member Medical Schools." *Id.* ¶ 49. Moreover, Count IV challenges "AAMC's Member

33

Medical Schools' require[ment that] applicants use" AMCAS. *Id.* ¶ 166. It is therefore impossible to disentangle Plaintiff's claim challenging AMCAS's fee structure from the membership services AAMC provides its "Member Medical Schools." Compl. ¶ 166. The CPPA "explicitly bar[s] claims, like plaintiff['s], relating to organizational membership," *In re APA Assessment Fee Litig.*, 766 F.3d 39, 53 (D.C. Cir. 2014). Thus, the CPPA's nonprofit safe harbor bars Count IV from proceeding because the claim relates to a nonprofit's membership services. *See, e.g.*, *id.* ("[T]he D.C. Council acted specifically to shield nonprofit organizations from statutory liability for membership-related disputes.").

*Second*, the Complaint alleges the primary application fees at issue were part of "providing students with the education for a medical doctor degree." Compl. ¶ 71. The primary application is the first, essential step in the process of obtaining this education and becoming a medical doctor. *See id.* ¶¶ 2, 74, 76, 165. Plaintiff's claim is thus "based on . . . training or credentialing activities." D.C. Code § 28-3905(k)(5). The unprecedented, contorted nature of Plaintiff's claim means there is no prior case interpreting the nonprofit safe harbor in the context of "education for a medical doctor degree," Compl. ¶ 71, so "plain text" is the starting point in interpreting this provision of the D.C. Code. *Goodrich ex rel. Robert D. Goodrich Revocable Tr. v. Bank of Am. N.A.*, 136 F.4th 347, 358–59 (D.C. Cir. 2025). Here, "[t]he plain text underscores" that the safe harbor applies. *Id.* at 358; *see* *Train*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/train (last accessed October 8, 2025) (defining "train" as "to teach so as to make fit, qualified, or proficient" and "to form by instruction"); *Credential*, https://www.merriam-webster.com/dictionary/credential (last accessed October 8, 2025) (defining "credential" as a "certificate [or] diploma"). The Merriam-Webster Dictionary even identifies "a doctor's credentials" as a specific example for its definition. *Id.*

Additional context reinforces the plain textual reading. Dismissing a CPPA claim against George Washington University related to its law school financial aid calculations, the D.C. Superior Court "held that obtaining a law degree 'is a training and credentialing activity.'" *Qureshi*, 2023 WL 2387811, at *6 (citing *Sanoian v. George Washington Univ.*, No. 18-cv-911, at 5 (D.C. Ct. App. Mar. 3, 2020) (slip op.)). In an unpublished memorandum opinion and judgment, the D.C. Court of Appeals affirmed the dismissal in *Sanoian* without deciding whether the safe harbor applied. *Id.* The D.C. Court of Appeals broadly framed the potential application of the safe harbor in *Sanoian* as whether it "bar[red] suits against universities based on the provision of financial aid." *Sanoian*, No. 18-cv-911, at 5 (slip op.) (attached as Exhibit A). The D.C. Court of Appeals observed that potentially broad bar "rais[ed] difficult questions about the scope of the CPPA that we need not address today." *Id.* Here, by contrast, the issue is much narrower and the safe harbor's application is straightforward. *Cf. Qureshi*, 2023 WL 2387811, at *6 & n.4 ("reserv[ing] judgment on whether undergraduates and graduate students might be treated differently in th[e] case" because "the possible professional connotations of the terms 'training or credentialing activities' more plausibly could apply" to "law school students").

Pursuing a medical degree constitutes "training and credentialing activity" because medical education is professional training and an M.D. is a credential. Longstanding precedent confirms this background understanding at the time the D.C. Council enacted the nonprofit safe harbor in 2007. *See, e.g.*, 15 U.S.C. § 37b(1)(E) (congressional finding that "physician training" is one of the "crucial missions" of U.S. "medical schools"); D.C. Code § 3-1210.03(g) ("Unless authorized to practice medicine under this chapter, a person shall not use or imply the use of . . . 'M.D.'"); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 313 (1978) ("[I]n a medical school . . . the training is centered primarily on professional competency."); 52 D.C. Reg. 6834 (July 22, 2005) (requiring

35

"[t]he equivalent of four (4) years of instruction and training in an accredited medical school and receipt of a degree of Doctor of Medicine or Doctor of Osteopathy" for a license to practice medicine in D.C.).

Accordingly, the CPPA's nonprofit safe harbor provides yet another independent reason Count IV fails to state a claim. *See, e.g.*, *Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, No. 23-cv-3570 (CRC), 2024 WL 4239936, at \*15–16 (D.D.C. Sept. 19, 2024) (dismissing CPPA claim under D.C. Code § 28-3905(k)(5)).

## CONCLUSION

The Complaint offers no plausible allegation or reasonable inference that AMCAS's output-expanding application software suite involves any anticompetitive conduct. It imagines an alternate universe where medical school applicants would pay less to submit dozens of individual and unique applications to medical schools using disparate processing software. Just the opposite is true. AMCAS provides significant, procompetitive value to medical schools and applicants, and its fees are far from unreasonable. Hamstringing AMCAS would benefit no one—not the tens of thousands of aspiring doctors who depend on it to ease the burden of applying to medical school and not the medical schools who depend on AMCAS to review and process these tens of thousands of applications. For the foregoing reasons and as summarized in Appendix A, AAMC asks the Court to dismiss the Complaint.

Dated: October 9, 2025

Respectfully submitted,

*/s/ Douglas E. Litvack*
Douglas E. Litvack (1024873)
Lindsay C. Harrison (977407)
Jariel A. Rendell (application pending)
Daniel Schwei (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
DLitvack@jenner.com
LHarrison@jenner.com
JRendell@jenner.com
DSchwei@jenner.com

*Attorneys for Defendant Association of American Medical Colleges*

37

**Appendix A**

**Summary of Claims and Independent Bases for Dismissal**

| Count | Claim | Statute | Independent Dismissal Bases |
|---|---|---|---|
| I | Price Fixing in Medical Doctor Education Market | Sherman Act Section 1 | The *per se* rule does not apply to price-setting by a joint venture under *Texaco v. Dagher*, 547 U.S. 1 (2006), and the Complaint fails to plausibly plead a rule-of-reason claim. |
| II | Price Fixing in Medical School Primary Application Platform Market | Sherman Act Section 1 | The *per se* rule does not apply to price-setting by a joint venture under *Texaco v. Dagher*, 547 U.S. 1 (2006), and the Complaint fails to plausibly plead a rule-of-reason claim. <br><br> Plaintiff lacks antitrust standing. |
| III | Monopolization of Medical School Primary Application Platform Market | Sherman Act Section 2 | Plaintiff lacks antitrust standing. <br><br> The Complaint fails to plausibly plead exclusionary conduct. |
| IV | Unconscionable and Unfair Trade Practice | D.C. Consumer Protection Procedures Act | Plaintiff's fees do not qualify as consumer transactions under the CPPA. <br><br> The Complaint fails to plausibly plead that the primary application fees are unconscionable. <br><br> The CPPA's nonprofit safe harbor bars Count IV. |

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2025, I filed the foregoing document with the Clerk of

Court for the United States District Court for the District of Columbia using the court's CM/ECF

filing system.

*/s/ Douglas E. Litvack*

Douglas E. Litvack (1024873)
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
DLitvack@jenner.com
