**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NIRVANA DURBAL,<br>*Plaintiff*,<br>v.<br>ASSOCIATION OF AMERICAN MEDICAL COLLEGES,<br>*Defendant*. | Civil Action No. 25-02537 (AHA) |

**Memorandum Opinion and Order**

Nirvana Durbal sues the Association of American Medical Colleges ("AAMC"), asserting that its pricing for medical school applications violates antitrust and consumer protection laws. AAMC moves to dismiss, arguing Durbal has not stated a claim. The court grants the motion in part and denies it in part, concluding that Durbal has stated a claim for unlawful restraint of trade in the medical doctor education market under Section 1 of the Sherman Antitrust Act but has not stated a claim for unlawful restraint of trade in the market for medical school primary application platforms under that section; for monopolization in the market for medical school primary application platforms under Section 2 of the Sherman Antitrust Act; or for unfair or deceptive trade practices under the D.C. Consumer Protection Procedures Act.

## I. Background[1]

AAMC is a nonprofit organization whose members include all accredited medical schools in the United States. ECF No. 1 ¶¶ 6, 18–19. According to the complaint, the member schools directly compete with each other and other medical schools for medical school applicants. *Id.* ¶ 21.

The complaint alleges that, at the direction of its member medical schools, AAMC developed a centralized application platform called the American Medical College Application Service ("AMCAS"). *Id.* ¶¶ 26, 31. The AMCAS platform collects the same general information about each applicant—including letters of recommendation, demographic information, test scores, grade point average, and other background information—which makes up an applicant's primary application. *Id.* ¶¶ 2, 53, 60. After inputting that information into AMCAS, medical school applicants can submit their primary application to multiple medical schools. *Id.* ¶ 32. Medical schools then receive and process applications and determine whether to invite applicants to submit school-specific secondary applications. *Id.* ¶¶ 2, 38.

More than 90% of U.S. medical schools require applicants to submit primary applications through AMCAS. *Id.* ¶ 30. AAMC charges applicants $175 for the first school they apply to and $47 for each school after that, regardless of which school it is. *Id.* ¶¶ 33, 36. AAMC sets these fees and has increased them over time. *Id.* ¶¶ 34–36. AAMC does not charge member medical schools to use the platform. *Id.* ¶ 38.

After schools receive primary applications through AMCAS they can ask applicants to submit a school-specific, secondary application for other information they want. *Id.* ¶¶ 2, 25, 37.

---

[1] As required at this stage, the court accepts the complaint's well-pled factual allegations and draws all reasonable inferences in Durbal's favor. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

Schools themselves decide what applicants pay to submit the secondary application and collect that fee directly from the applicants. *Id.* ¶¶ 37, 63, 83.

Durbal applied to eleven medical schools through AMCAS in the 2024 medical school application cycle, paying $625 in primary application fees to AAMC. *Id.* ¶ 85. She now sues on behalf of a putative class of individuals who paid primary application fees to AAMC to apply to U.S. medical schools, asserting claims for unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, monopolization in violation of Section 2 of the Sherman Antitrust Act, and unfair trade practices in violation of the D.C. Consumer Protection Procedures Act ("CPPA"). *Id.* ¶¶ 89, 102–68. AAMC moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 15.

## II. Discussion

To survive dismissal for failure to state a claim, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The court "must take all the factual allegations in the complaint as true," though it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Durbal's antitrust claims require her to identify the relevant market in which the anticompetitive behavior happened. *See Gross v. Wright*, 185 F. Supp. 3d 39, 49–50 (D.D.C. 2016) (unlawful restraint of trade); *PhantomALERT Inc. v. Apple Inc.*, 183 F.4th 790, 800 (D.C. Cir. 2026) (monopolization). AAMC argues Durbal does not have standing to assert anticompetitive behavior in one of the markets she relies on—the market for medical school primary application platforms. The court starts with that argument and agrees that Durbal lacks standing for that

market. The court then considers whether Durbal has plausibly alleged a claim for unlawful restraint of trade in the market for medical doctor education and concludes that, taking all the allegations as true, she has. Finally, the court considers whether Durbal has plausibly alleged a CPPA claim and concludes that she has not.

### A. Durbal Does Not Plausibly Allege Standing To Challenge Anticompetitive Conduct In The Market For Medical School Primary Application Platforms

Durbal asserts claims for unlawful restraint of trade and monopolization in the market for medical school primary application platforms (counts two and three), but she doesn't have antitrust standing to do so because she is not a participant in that market.

Antitrust standing, distinct from the more familiar Article III standing, is statutory and claim-specific. *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 981 (D.C. Cir. 2017). "It asks 'whether the plaintiff is a proper party to bring a private antitrust action.'" *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). And that "requires a plaintiff to show an actual or threatened injury 'of the type the antitrust laws were intended to prevent' that was caused by the defendant's alleged wrongdoing." *Id.* at 982 (quoting *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001)). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Courts have therefore recognized that "the antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market and 'suffered its injury in the market where competition is being restrained.'" *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 44 (D.D.C. 2024) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)); *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016)

(explaining that "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained"). And "parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Sensory, Inc. v. Google LLC*, No. 24-cv-02788, 2026 WL 2017536, at *5 (D.D.C. July 13, 2026) (alteration omitted) (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)). Thus, "consumers and competitors are most likely to suffer antitrust injury." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057.

Durbal premises her monopolization claim and one of her unlawful restraint of trade claims on "the market for a platform to handle primary applications to U.S. medical schools"—that is, the market for software to receive and process primary applications to medical schools. ECF No. 1 ¶ 79; *see id.* ¶¶ 122–57; *see also id.* ¶ 31 (describing the primary application platform as "a suite of software to process electronic applications"). She alleges that the products in the market include AAMC's platform, used by the vast majority of U.S. medical schools, and other platforms used by the small minority of U.S. medical schools that do not use AMCAS. *Id.* ¶¶ 79–80. The competitors in this market are entities that would provide "alternative application platforms" for medical school primary applications. *Id.* ¶ 151. And the consumers are medical schools that choose which platform to use. *Id.*; *see id.* ¶ 81 (alleging that "[n]early all of the Member Medical Schools have chosen to use AAMC's Primary Application Platform"); *see also id.* ¶ 148 (measuring the market share based on the percentage of medical schools that have chosen to use the AMCAS platform).[2]

---

[2] In some instances, there can be a two-sided transaction platform market in which the platform "cannot make a sale to one side of the platform without simultaneously making a sale to the other," and the transactions are therefore "jointly consumed" by persons on both sides of the platform. *Ohio v. Am. Express Co.*, 585 U.S. 529, 535, 545 (2018). AAMC argues that the market for medical school primary application platforms does not meet this definition, and Durbal does not argue otherwise. *See* ECF No. 15-1 at 19–20.

But Durbal does not plausibly allege she participates in that market. She is not a competitor who develops or provides software to medical schools to handle primary applications, and she is not a consumer of those products like the medical schools that choose the platform they will use to receive and process applications. Durbal does allege she used AAMC's application platform to submit her applications to medical school, and she alleges that she paid fees to AAMC to use the platform. *See* ECF No. 1 ¶ 85. While that makes her a participant in the market for medical doctor education, it does not make her a participant in the market for the platform itself. *See Hogan v. Amazon.com, Inc.*, No. 24-1893, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025) (concluding that plaintiffs did not plausibly allege antitrust injury where they alleged "that Amazon has restrained competition in the business-facing logistics services market, but their alleged injuries occurred in the consumer-facing online retail market" (quotation marks omitted)). In other words, Durbal is "precisely the kind of party 'whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market,'" namely, the market for providing students with the education for a medical doctor degree. *Sensory, Inc.*, 2026 WL 2017536, at *8 (quoting *Qualcomm Inc.*, 969 F.3d at 992). And, even assuming she plausibly alleged anticompetitive conduct that led to anticompetitive effects in the primary application platform market (where she is not a participant) and, in turn, affected the medical doctor education market (where she is a participant), that would not give her antitrust standing in the primary application platform market. *See Sensory, Inc.*, 2026 WL 2017536, at *6 (rejecting the proposition that "a plaintiff who suffers injury in one market can claim antitrust injury in a different market simply because the purported injuries can be traced to the same anticompetitive conduct").[3]

---

[3] Durbal does not argue that her injuries are "'inextricably intertwined' with the injuries of market participants." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057 n.5 (quoting *Blue Shield of Va. v.*

### B. Durbal Plausibly Alleges A Horizontal Restraint Of Trade In The Medical Doctor Education Market In Violation Of Sherman Act Section 1

The parties do not dispute that Durbal participates and has alleged injury in the market for medical doctor education, and Durbal claims that setting primary application fees at the same price for every school is a horizontal restraint of trade in that market, in violation of Section 1 of the Sherman Antitrust Act. *See* ECF No. 18 at 11 (AAMC conceding it "does not challenge Plaintiff's antitrust standing at the pleading stage to bring" a claim in the medical doctor education market "because she is a customer in the putative market"); ECF No. 1 ¶¶ 102–21. Section 1 of the Sherman Act says "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Although that "could be interpreted to proscribe all contracts," the Supreme Court "has never taken a literal approach to its language" and has instead "repeated time and again that § 1 outlaws only unreasonable restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (alterations and quotation marks omitted). To state a claim under Section 1, a plaintiff must allege "(1) that defendants entered into some agreement for concerted activity (2) that either did or was intended to unreasonably restrict trade in the relevant

---

*McCready*, 457 U.S. 465, 484 (1982)). That exception to the general rule requiring market participation "applies narrowly to cases where the plaintiff was used as a conduit to harm the defendants' actual competitors, such that the plaintiff's harm is an indispensable aspect of the scheme." *Sensory, Inc.*, 2026 WL 2017536, at *7 (quotation marks omitted); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 339f (5th ed. 2023 & Supp. 2026).

Durbal relies on *Apple Inc. v. Pepper*, 587 U.S. 273 (2019), for the proposition that "immediate buyers from the alleged antitrust violators may maintain a suit against the antitrust violators." *Id.* at 279 (quotation marks omitted). There, the Supreme Court considered whether the plaintiff consumers were "*direct* purchasers" who could sue or "*indirect* purchasers who are two or more steps removed from the violator" who could not. *Id.* at 279. But even accepting Durbal was a direct purchaser, the point is that she was a direct purchaser in applying to medical schools, not in purchasing application platforms. The court in *Pepper* did not suggest that being a direct purchaser in one market authorizes suit in another.

market, which (3) affects interstate commerce." *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 33 F. Supp. 3d 14, 19 (D.D.C. 2014). Here, AAMC challenges only the second prong—whether Durbal has plausibly alleged AAMC unreasonably restricted trade. *See* ECF No. 15-1 at 9–17.

Some restraints on trade "are deemed unlawful *per se*" and, for others, "[t]he rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1." *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 885–86. "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Meanwhile, under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 885.

Durbal says she has plausibly alleged a horizontal price-fixing agreement that is unlawful *per se*. *See Dagher*, 547 U.S. at 5 (recognizing that "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements," are unlawful *per se*). But, as AAMC observes, the Supreme Court has held "the pricing decisions of a legitimate joint venture do not fall within the narrow category of activity that is *per se* unlawful under § 1 of the Sherman Act." *Id.* at 8. Rather, where the plaintiff challenges the price set by two entities for goods they produce and sell as part of a joint venture, it "amounts to little more than price setting by a single entity—albeit within the context of a joint venture—and not a pricing agreement between competing entities with respect to their competing products." *Id.* at 5; *see also* Areeda & Hovenkamp, *supra*, ¶ 2132c (explaining that "when firms participate in a traditional production joint venture that produces an essentially undifferentiated product, the venture cannot be

condemned simply because it sells its output at the same price, even if part of the output is allocated to one joint venture participant, part to another, and so on"); *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1013 (N.D. Cal. 2008) (explaining that "*Dagher* teaches that" challenges to "a joint venture's right to put a price on the good that the venture produces . . . must be analyzed under the rule of reason"); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 724–75 (6th Cir. 2019) (explaining that "restraints that are *core* to the joint venture's efficiency enhancing purpose" are analyzed under the rule of reason).

And here, the complaint appears to allege a joint venture: that member medical schools directed AAMC to develop AMCAS as a "suite of software to process electronic applications" that would allow applicants to submit a single primary application to apply to multiple medical schools. ECF No. 1 ¶¶ 31–32. And member medical schools "control AAMC's development" and "direct the features, structure, services, and other aspects" of the platform. *Id.* ¶¶ 27, 29. The complaint further alleges that, absent their direction to develop the AMCAS platform, individual medical schools would build or contract with a vendor to host their own application platforms or develop some other platform in conjunction with other medical schools. *See id.* ¶¶ 52–65. These allegations may well describe a joint venture. *See* Areeda & Hovenkamp, *supra*, ¶ 2100a ("A joint venture is a form of organization in which two or more firms agree to cooperate in producing some input that they would otherwise have produced individually, acquired on the market, or perhaps would have done without."); *Dagher*, 547 U.S. at 6 (explaining a joint venture arises when those "who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit"); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 199 (2010) ("Any joint venture involves multiple sources of economic power cooperating to produce a product."). And Durbal's challenge to the pricing of AMCAS concerns "the pricing of the very goods produced

and sold by" the joint venture—a "core activity of the joint venture itself." *Dagher*, 547 U.S. at 7–8; *see In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d at 1013 (explaining that defendants' setting of "the price that one party to the transaction pays the other party for the joint venture's product" was a core activity of the joint venture subject to rule of reason analysis).

But, even accepting that the complaint describes AAMC as a joint venture between its member medical schools, Durbal has plausibly alleged anticompetitive effects that would render AAMC's price setting unlawful under the rule of reason. "The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (cleaned up). "To determine whether a restraint violates the rule of reason . . . a three-step, burden-shifting framework applies." *Id.* "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

A plaintiff can show anticompetitive effects on the market by direct evidence, "such as reduced output, increased prices, or decreased quality in the relevant market," or indirect evidence, such as "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* At the motion to dismiss stage, a plaintiff need only "plausibly allege an actual or potential anticompetitive effect." *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d 218, 225 (D.D.C. 2017). "This requires the plaintiff to 'sketch the outline of the injury to competition with allegations of supporting factual detail' and to 'plead an

injury to competition beyond the impact on the plaintiffs themselves.'" *Fotobom Media, Inc.*, 719 F. Supp. 3d at 50 (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012)). "Conclusory allegations of supracompetitive prices are not sufficient." *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d at 225.

Drawing reasonable inferences in Durbal's favor, as the court must, the complaint plausibly alleges that the AAMC's setting of a uniform price for primary applications across member schools has impeded competition. Durbal specifically alleges AAMC's uniform pricing has caused prices higher than in a competitive market, supported by reference to comparable application platforms that operate in competitive markets. *See* ECF No. 1 ¶ 9 (alleging that "[a]pplications to other institutions of higher education have much lower application fees"); *id.* ¶ 57 (alleging that "AAMC's fees charged to medical school applicants dwarf what a centralized application service could charge in a competitive market where schools and the centralized service have not insulated themselves from competition"). For example, the complaint alleges the "Common Application" provides a centralized application mechanism for undergraduate schools but allows the individual schools to determine the fee rather than requiring applicants to pay a set fee across all schools. *Id.* ¶¶ 55–56. According to the complaint, the schools that use the "Common Application" compete on fees, and many charge no fee at all. *Id.* ¶ 56. The complaint also alleges that graduate business schools each have their own application and associated fees, which can be as low as $30 and as high as $275, with the pricing of applications often reflecting the school's prestige and ranking. *Id.* ¶ 61. On these allegations, Durbal has plausibly alleged the prices AAMC charges for the AMCAS primary application are higher than those that might be observed but for the challenged restraints. *See Am. Express Co.*, 585 U.S. at 547–48 (explaining the need for plaintiffs to show that the price was "higher than the price one would expect to find in a competitive market").

Durbal also alleges AAMC has charged primary application fees that far exceed costs. According to the complaint, the actual cost of processing medical school primary applications is no more than a few dollars per application and therefore "a student applying to one medical school pays . . . more than a 7,000% markup on the application processing cost in a competitive market." ECF No. 1 ¶¶ 8, 63, 164. At the same time, the complaint alleges comparable platforms provide application processing services at that cost and charge less to applicants than AMCAS. *Id.* ¶¶ 8–9. For example, Georgia Tech's business school pays an outside vendor a few dollars per application for its application software but charges only a $95 all-in application fee. *Id.* ¶ 62. These allegations, taken as true and considered alongside the complaint as a whole, support a reasonable inference that AAMC's uniform pricing of medical school primary application fees has led to anticompetitive effects. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 61 (2d Cir. 2019) (concluding that there was sufficient evidence of supracompetitive pricing where defendant's profits were much higher than those of comparable companies, and defendant was charging almost three times as much as it would have charged in a competitive market).

AAMC argues that Durbal has not plausibly alleged an unlawful restraint of trade because her complaint does not address and dispel possible procompetitive benefits of the alleged price setting. ECF No. 15-1 at 16. But at this stage, Durbal need not rebut AAMC's arguments that the challenged restraint has procompetitive benefits. *See Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 329 (S.D.N.Y. 2018) ("At this stage of the litigation, the possibility that Defendants' conduct could conceivably be characterized as improving competition does not warrant dismissal."); *Fotobom Media, Inc.*, 719 F. Supp. 3d at 52 (declining to consider arguments against anticompetitive effect on a motion to dismiss a Section 1 claim).

The court therefore concludes Durbal has plausibly alleged that AAMC's uniform pricing of primary application fees is an unreasonable restraint of trade in the medical doctor education market under the rule of reason, in violation of Section 1 of the Sherman Antitrust Act.

### C. Durbal Does Not Plausibly Allege That Purchasing Primary Application Services Is Part Of A Consumer Transaction And Therefore Does Not State A CPPA Claim

Durbal's final count asserts a claim under the CPPA, which makes it unlawful to engage in "an unfair or deceptive trade practice," including to "fail to state a material fact if such failure tends to mislead" or "make or enforce unconscionable terms or provisions of sales." D.C. Code § 28-3904(f), (r). But a "valid claim for relief under the CPPA must originate out of a consumer transaction." *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006); *see also Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010). The CPPA defines "consumer," when used as an adjective, to mean "anything, without exception" that a person "does or would purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes." D.C. Code § 28-3901(a)(2)(B)(i). "[P]urpose is the touchstone of the CPPA's definition of 'consumer,'" and transactions normally intended "to promote business or professional interests" are not "consumer" transactions. *Shaw*, 605 F.3d at 1043.

Durbal does not plausibly allege she and other applicants "normally" purchase medical school primary application services "for personal, household, or family purposes." D.C. Code § 28-3901(a)(2)(B)(i). Rather, the complaint alleges that people apply to medical school for professional reasons—namely, to become doctors. *See, e.g.*, ECF No. 1 ¶¶ 4, 74, 76, 78. According to the complaint's allegations, Durbal and other applicants therefore purchase medical school primary application services to promote professional interests, not for personal purposes. *See MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 661 (6th Cir. 2013) (concluding that the purchase of legal education was not covered by Michigan's consumer protection act because the

complaint alleged that each law school graduate "intended to use his or her law degree to prospectively better themselves and their personal circumstances *through the attainment of full-time employment in the legal secto*r" and therefore "did not attend law school for personal purposes" (quotation marks omitted)); *Reynolds v. Concordia Univ.*, No. 21-cv-2560, 2022 WL 1323236, at *18 (D. Minn. May 3, 2022) (concluding that purchase of a nursing education fell outside the scope of Oregon's consumer protection statute because a nursing education is "ordinarily something used for 'commercial' or economic purposes—to earn a living—and this is true despite the attendant personal fulfillment or benefits it might bring"); *cf. Qureshi v. Am. Univ.*, No. 20-cv-1141, 2023 WL 2387811, at *7 (D.D.C. Mar. 7, 2023) (distinguishing the legal education at issue in *MacDonald* from undergraduate education based on the fact that *MacDonald* involved graduate students who conceded in their complaint that they intended to use their degrees to pursue employment). To be sure, as Durbal points out, the decision to apply to medical school can be "personal" in a sense. *See* ECF No. 17 at 22. As the complaint puts it, "[y]oung adults aspire to be doctors even though the educational path is long and expensive." ECF No. 1 ¶ 1. But that single allegation that application to medical school has a personal component does not reasonably support the inference that applicants "normally" submit medical school primary applications for personal reasons. *See In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 779 F. Supp. 3d 624, 655 (M.D.N.C. 2025) (concluding that the purchase of crop protection products for the plaintiffs' business was not a consumer transaction under the CPPA, despite the plaintiffs' contention that their purchase of crop protection products had in it a "personal ingredient"); *cf. Qureshi*, 2023 WL 2387811, at *7–8 (holding that undergraduate education was a consumer service under the CPPA where the plaintiffs "allege[d] a host of interests in attending [college]

that have everything to do with the personal experiences and opportunities for enrichment of a college campus and nothing to do with business or professional intentions").

Lastly, Durbal argues that her purchase of medical school primary application services falls within the CPPA because she is not a reseller of such services, citing to D.C. Court of Appeals caselaw indicating that if a "purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act." *Ford*, 908 A.2d at 84 (quoting *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989)). But "usually does not mean always, and an individual who purchases a good without the intent to resell is not always a consumer." *Shaw*, 605 F.3d at 1043. "That is why the *Ford* court indicated that the CPPA would not apply to a business's purchase of office supplies, 'even though such goods would not be resold.'" *Id.* (quoting *Ford*, 908 A.2d at 84 n.12)). Just as the purchase of office supplies serves a business purpose, Durbal's allegations reflect that her purchase of medical school primary application services serves a professional purpose. Durbal therefore has not stated a CPPA claim.[4]

---

[4] As Durbal points out, since the D.C. Circuit's decision in *Shaw*, the CPPA was amended to require a purchase "normally" used for personal, household, or family purposes in place of earlier language requiring that the purchase "primarily" be for those purposes. *See* ECF No. 17 at 21–22; D.C. Code § 28-3901(a)(2) (2010). That amendment removed "any necessity to prove what portion of a consumer's use of the good or service is devoted to personal, household, or family purposes, so long as one of those purposes can be shown to be among a consumer's normal uses of the good or service." D.C. Council Comm. on Pub. Servs. & Consumer Affs., Report on Bill 19-0581, the "Consumer Protection Amendment Act of 2012," at 3 (Nov. 28, 2012), https://lims.dccouncil.gov/downloads/LIMS/26337/Committee_Report/B19-0581-CommitteeReport1.pdf. But it remains here, as in *Shaw*, that a transaction "to promote business or professional interests" is not one "for personal, household, or family purposes." *Shaw*, 605 F.3d at 1043; D.C. Code § 28-3901(a)(2)(B)(i).

## III. Conclusion

For these reasons, AAMC's motion to dismiss, ECF No. 15, is granted in part and denied in part.

AMIR H. ALI
United States District Judge

Date: September 24, 2026